HENRY POST, appellant,

*v.*

SADIE HAGAN et al., respondents.

[Submitted March 26th, 1906. Decided March 4th, 1907.]

1. If a child, upon whom a parent by reason of advanced years or infirmity has in fact come to be dependent, accepts from such dependent parent a voluntary conveyance of all of his or her estate, a court of

equity, moved by the apparent improvidence of such gift, will presume that the donor did not appreciate the consequence to himself of his voluntary act, and hence will place upon the donee the burden of overcoming this presumption by showing that the donor in making the conveyance had the benefit of proper independent advice.

2. Proper independent advice, in this connection, means that the donor had the preliminary benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was, furthermore, so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidentially as to the consequences to himself of his proposed benefaction.

3. The cases of *Haydock* v. *Haydock's Executors, 34 N. J. Eq.* (7 *Stew.*) *570,* and *Slack* v. *Rees, 66 N. J. Eq.* (*21 Dick.*) *447,* distinguished and the latter case applied.

———

On appeal from a decree of the court of chancery advised by Vice-Chancellor Stevenson, who filed the following conclusions:

My conclusion is that the bill of complaint should be dismissed.

1. There are facts proved in this case which taken by themselves cast the burden upon the defendant Mrs. Hagan of showing that the deeds which she received from her mother are untainted by fraud of any kind.

Mrs. Telfer, the grantor, was sixty-three years of age at the time of her death, on June 16th, 1899. The deeds were executed June 9th, 1899, and conveyed practically all the grantor's estate. The complainant and the defendant Mrs. Hagan were the two children of Mrs. Telfer, Mrs. Hagan being somewhat older than her brother. The evidence is inadequate to show that Mrs. Telfer, during her lifetime, had given her son, the complainant, what would naturally be deemed his portion of her estate. For ten years preceding her death Mrs. Telfer lived with the defendants, who appear to have occupied a comfortable house on a farm at Secaucus. The complainant, who had a wife and children appears to have resided under conditions of poverty in small quarters which he rented or were rented for him in Hoboken.

At the time the deeds were executed Mrs. Telfer was confined to her room, if not to her bed, suffering from the disease from which she died, and undoubtedly she was contemplating her

death as an event which was near at hand. Physically Mrs. Telfer was, to a very large extent, if not exclusively, within the absolute control of the defendants.

2. Stating the presumption established against the deeds by the foregoing facts in the strongest possible way, in my opinion the defendants have discharged the burden cast upon them and have established by evidence, which is entirely convincing to my mind, that these deeds were the voluntary intelligent act of Mrs. Telfer in execution of a purpose which she formed in her own mind unaffected by any influence or suggestion from the defendants or either of them.

The main fact which tends to explain and vindicate the transaction under investigation is that the complainant for years had been a drunkard and a spendthrift. At the time the deeds were made he was forty-one years of age, and it does not appear that he was making or had made any effort to reform. His status appears to have been fixed as that of a person entirely unfit to be entrusted with property. His mother, Mrs. Telfer, distinctly recognized this status long before her last illness began. The witnesses on both sides abundantly show that Mrs. Telfer for a long time aided her spendthrift son and his family with contributions of money. Mr. Frank Sturges, a brother of Mrs. Telfer, who was called on behalf of the complainant, and whose testimony was not in the slightest degree impeached, testified that Mrs. Telfer paid her son's rent and grocery bills, and stated to the witness that if she gave him the money to pay them she would have to pay them over again "because he would go and blow it in." This same witness also said that at an interview which he had with his sister in the first part of May, at a time when it appears distinctly she was not confined to her room and was evidently competent to attend to business, she expressed a desire to "get over the hill" in order to consult counsel with a view to having "the property fixed up," and at that time she told this witness that she "wanted to leave the property to Henry as long as he lived and then after his death to go to his children," and that she declared "if I leave it to him he will drink it up, and he will have no home and the children will have nothing." Mrs. Rosen, a sister of Mrs. Telfer and a witness for the complain-

ant, testified that Mrs. Telfer often told her that if Henry would not drink she would deed him the farm, but that she knew that if she gave the farm to him he would waste it, and that "she wanted it fixed so that he could not waste it, so that Mary, complainant's wife, would have something to take care of the children." This witness also testified that in the first part of May Mrs. Telfer expressed the hope that she would get strength so that she might "go up and have it fixed, have the papers fixed so that Mary would have something to take care of the children."

Cornelius B. Sturges, a brother of Mrs. Telfer, testified on behalf of the complainant that Mrs. Telfer told him, at his house at Union Hill, some months before her decease, that she was going to have her children "share and share alike," but she also said: "1 will have it fixed so that Hank cannot spend the money; that it will go to his children."

It seems plain from the testimony that Mrs. Telfer for a long time before her death must have intended not to die intestate and leave one-half of her little estate to descend to this spendthrift son, who appears to have been capable of squandering it within a very short time.

3. The question arises what a woman in Mrs. Telfer's position would naturally do under the circumstances above stated. The evidence satisfies me that for a long time prior to her death, while Mrs. Telfer was not only in full possession of her faculties, but able to go back and forth between Secaucus and Hoboken or Jersey City without difficulty, she contemplated "making papers" which would dispose of the farm or of half of her entire estate in such manner that her son could not waste it, while he and his family would have the benefit of it. She talked about conferring with lawyers, but with abundant opportunity for obtaining such assistance she refrained from doing so. It is significant that in none of the quite numerous statements of the witnesses in regard to Mrs. Telfer's declarations there is no clear indication that the "papers" with which she contemplated "fixing" up her affairs included a will. One witness referred to a paper of some sort which had been made ten years before Mrs. Telfer's death, and by which some disposition of property among

her children was effected, but while this witness stated that
Mrs. Telfer destroyed the paper it does not appear whether such
paper was a will or a deed. While Mrs. Telfer may have re-
frained from employing counsel because of an unwillingness to
incur the expense, or may have for some other reason merely
procrastinated in regard to the matter, it is probable that most
persons would surmise from the evidence in this case that this
old woman evaded the discharge of what probably she deemed
her duty on account of a sentiment or superstition which exer-
cises a controlling influence over many minds. Not infre-
quently persons who are strongly influenced by this sentiment
or superstition allow themselves gradually to approach death,
which they see before them as inevitable within a few weeks or
months, while they know that they are violating most solemn
obligations in respect of the disposition of their property after
death by refraining from making a will.

But whatever may have been the cause of Mrs. Telfer's con-
duct, the fact is proved beyond dispute that while she recog-
nized that she was beset with difficulties in endeavoring to make
a proper disposition of her property, and that she ought to seek
competent legal advice and assistance, she deliberately refrained
from seeking such advice and assistance. If she had gone to a
competent lawyer she probably would have learned that a spend-
thrift trust might be created by will or by deed which would
present a complete solution of the problem which she was en-
deavoring to solve alone. But whether a spendthrift trust could
have been devised which would have satisfied Mrs. Telfer's mind,
and would have accomplished the object which she had in view,
relating to the support of her son and to the protection of the
property from his improvidence, is a matter about which it is
vain to undertake to speculate. Mrs. Telfer, although proved
to have been a woman of force of character and intelligence,
presumably knew nothing of spendthrift trusts, and for some
reason refrained from seeking legal advice. She stared at the
problem before her and apparently allowed months to go by
during which she slowly but surely approached her end en-
deavoring to solve this problem without help from anyone.

In my opinion the evidence shows that the conveyance of this

property to Mrs. Hagan was the solution which Mrs. Telfer finally reached of the difficult problem which she had long been studying. I think also that the evidence would probably satisfy most minds that from Mrs. Telfer's point of view with the knowledge that she had, what she did was altogether wise and prudent. Mrs. Telfer probably knew that if she left the farm or any property to her son for life that such life estate would be within his control and would be forthwith squandered. The choice that Mrs. Telfer seems to have finally made was between allowing one-half of her estate to descend upon her death to this spendthrift, who would immediately waste it, or to convey the whole of the estate in her lifetime to her daughter. If she were to die intestate she firmly believed that the half of her estate which her son would receive would soon be dissipated, and he and his family would derive no permanent benefit from it. On the other hand, the evidence indicates distinctly that Mrs. Telfer contemplated that the gift of the whole estate to Mrs. Hagan would involve the administration of it, or a part of it, by Mrs. Hagan for the benefit of this unfortunate son. This devise, which is attacked as inofficious, appears, after all, to have been intended in part at least as a settlement in the nature of a spendthrift trust, however impossible it may be for any court of law or equity to deal with it in that character. It is not an uncommon thing for testators of intelligence, with the aid of counsel, to make an absolute gift which the legatee knows well is to be sacredly applied to the benefit of some person unnamed in the will. The evidence shows that Mrs. Telfer, whose maiden name was Sturges, comes from good stock. There is nothing in this case which reflects upon the character of any member of this family, three generations of which are represented among the witnesses, excepting what has been already set forth in regard to the complainant. The defendants impressed me as honest, trustworthy people. The indications to my mind are very strong that the defendant Mrs. Hagan, who is somewhat older than her brother, the complainant, might well be entrusted by her mother to occupy in a measure a relation to her brother, after her mother's death, similar to that which the mother in her lifetime had occupied. Mrs. Hagan, on her direct examina-

tion, testified frankly that the day after the deeds were delivered to her she had a conversation with her mother in which her mother said: "The property is yours, don't give him a dollar, but don't let him want for bread." On her cross-examination she repeated this solemn injunction which her mother gave her practically on her dying bed.

It is not surprising that Mrs. Telfer, with a daughter like Mrs. Hagan, should have concluded that the conveyances which she made were the wisest and best means of accomplishing all the objects which she had in view in relation to the support of her son and his family.

The testimony of Judge Paxton directly supports the explanation of these conveyances above set forth. This experienced lawyer, in view of the character of the deeds, naturally felt it his duty to proceed with great caution and to be sure that the deeds expressed the final and intelligent determination of the grantor's mind. He accordingly reminded Mrs. Telfer that she had a son and she replied: "I know what I am doing and I think he has all that he deserves. I am disposed to leave it to the generosity of my daughter to give him (if he is entitled to anything) what he is entitled to." Elsewhere the witness says that Mrs. Telfer said that "she was disposed to trust her daughter to do what she might think was right and what he might be deserving of."

4. I shall not discuss the evidence at length. The complainant's case stands on the allegations of the bill that the deeds were obtained by fraud and undue influence in the abuse of fiduciary relations, and at a time when the grantor's mind had become impaired by disease to such an extent as to render her incapable of performing any legal act.

There is no evidence that can support these extreme allegations. The proof of a fiduciary relation need not be considered. I find as a fact that when these deeds were made the grantor, though weak, was in the full possession of her intellectual faculties, and that her will power was practically unimpaired, and that as a matter of fact no influence of any kind was exerted upon her by or on behalf of the defendant or either of them leading to the execution of these instruments. Of course, the wit-

nesses who know most about the execution of these deeds are the defendant Mrs. Hagan and Judge Paxton. The testimony of these witnesses is throughout, I think, characterized by frankness and apparent honesty. Judge Paxton received the order to draw the deeds about a week before he prepared them and took them to Secaucus for execution. There seems to have been no urgency about the matter, and Mrs. Hagan's testimony, which is corroborated I think, indicates that she, Mrs. Hagan, thought that her mother intended to make a will, and voluntarily procured information which she thought would be required in carrying out that purpose. When Judge Paxton found it convenient on account of an appointment at North Bergen he drew the deeds and took them to Mrs. Hagan's house in Secaucus. He had no personal acquaintance with Mrs. Telfer but was acquainted with very many members of her family. He knew of her and she knew of him. Judge Paxton testifies most positively to the effect that Mrs. Telfer though physically weak was entirely rational, and the picture which he presents is that of a woman who is engaged in carrying out a plan of her own.

It is perhaps worth noticing that the answers in this case, which are not under oath, set forth that the deeds in question were made in order to make the property received by the daughter equal in amount to the property which the son had already received in the lifetime of his mother. The statements made by Mrs. Telfer to Judge Paxton, which he testifies to most positively, accord with this allegation of the answer and no doubt were the origin thereof. Mrs. Hagan, however, in her testimony does not stand her case on any such claim. She admits that she received all her mother's estate charged with an obligation, the moral force of which she does not undertake to deny.

The exact matter to be decided in this cause must be kept ever in view while examining the evidence. We are not inquiring whether these conveyances were in fact wise and prudent transfers of property, or must be considered as effecting a harsh and unjust exclusion of the complainant from a share of the estate of his mother to which he had a moral claim; or whether if Mrs. Telfer had been properly advised and aided by counsel she would have made these conveyances. The sole question is,

did Mrs. Telfer act voluntarily and intelligently in making these conveyances, or were they obtained from her by fraud or undue influence?

Without stating the evidence bearing on this question I have endeavored to make plain what seems to me to be the point of view from which the examination of the evidence should be conducted and from which it appears to me quite plain that the question must be answered in favor of the defendants.

*Mr. James A. Gordon,* for the appellant.

*Mr. Charles C. Black* and *Mr. William T. Hoffman,* for the respondents.

· · The opinion of the court was delivered by

GARRISON, J.

To the facts found, and found correctly, as we think, by the learned vice-chancellor, he applied the rule as to undue influence laid down in *Haydock* v. *Haydock's Executors, 34 N. J. Eq.* (*7 Stew.*) *570,* whereas in our opinion he should have applied the rule as to independent advice laid down in this court in *Slack* v. *Rees, 66 N. J. Eq.* (*21 Dick.*) *447.*

Both cases were decided by this court, and the essential difference between them is that the rule of *Slack* v. *Rees* has specific application to cases in which the gift if valid has the effect of stripping the donor of all or practically all of his property, whereas the rule followed in *Haydock* v. *Haydock* applies generally to gifts that bear no such relation to the donor's entire estate.

*Slack* v. *Rees* goes further than *Haydock* v. *Haydock* to just the extent required by this additional circumstance that marks the distinction between them.

This distinguished circumstance, namely, that a person already aged or infirm or otherwise dependent should give to the one upon whom he thus depends practically his whole living beyond recall, and at the very time when apparently he had most need to retain it, raises in the mind of a chancellor the

presumption that the donor may not have appreciated the irrevocable character of his act or that he did not foresee its legal consequences to himself. This presumption of apparent improvidence gives rise to the special rule followed in *Slack* v. *Rees* which may be called the rule of independent advice. By force of this rule, if a person upon whom another has in fact come to be dependent accepts a gift from such dependent person of all of his or her estate, a court of equity, moved by the apparent improvidence of such a gift, casts upon the donee the burden of showing that the donor had the benefit of proper independent advice. Proper independent advice in this connection means that the donor had the preliminary benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefaction.

The practical distinction between this rule and that applied by the learned vice-chancellor in the present case is so clearly pointed out by Chief-Justice Gummere in *Slack* v. *Rees* that I cannot do better than cite here a pertinent extract from the opinion delivered by him in that case, the essential facts of which, by the way, were exactly those of the case now before us: "The normal relation of parent and child, as it had existed in earlier years, had been reversed, and the daughter had come to be the guardian of the father. In this situation the law presumes that a gift made by the parent to the child is the product of undue influence, and casts upon the latter the burden of proving the contrary. A decision upon this point in the case, however, is rendered unnecessary, as we conclude that the conveyance must be set aside, because in making it the donor did not have the benefit of competent and independent advice as to its effect.

"That the absence of such advice will invalidate a deed of gift, which contains no power of revocation, where a relation of trust and confidence exists between the donor and donee, is not denied, and, indeed, it was so held by the vice-chancellor.

He seems to have considered, however, that such relationship was not shown, unless it was made to appear that the donee occupied such a dominant position toward the donor as to raise a presumption that the latter was without power to assert his will in opposition to that of the donee. But this is not the situation. The rule has a much broader sweep. Its purpose is not so much to afford protection to the donor against the consequences of undue influence exercised over him by the donee as it is to afford him protection against the consequences of voluntary action on his part, induced by the existence of the relationship between them, the effect of which, upon his own interests, he may only partially understand or appreciate." In an earlier part of the opinion the essential facts referred to were thus stated: "On the day before his death he (the father) executed a deed to his daughter, conveying to her two houses and lots in the city of Trenton. He owned no other real estate, and his personal property was insufficient for the payment of his debts."

That the facts of the present case bring it within the rule of *Slack* v. *Rees*, both as to the relationship of the parties and the necessity of independent advice, appears fully from the conclusions of the vice-chancellor. That the improvidence of the gift was apparent even to the recipient of it appears in certain testimony given by the donee and not cited by the vice-chancellor. I refer to the answer given by the donee to a question put to her by the vice-chancellor, after the witness had testified that her mother had told her to get the deeds recorded, but that she had not done so. The question was why she had not done so, to which her answer was: "Because I have heart trouble and I never expected my mother to die, and if I should die before my mother my children would have it, the property, and what would my mother have had? She would not have had anything." This naïve answer discloses at once the precise situation to which the rule of *Slack* v. *Rees* applies, as well as the reason for the rule and the necessity for its application.

That the donor in the present case ought to have had independent advice must be taken to be entirely established. That she did not have it is also clearly shown. Judge Paxton, the lawyer who drew the deeds and took the donor's acknowledg-

ments, was employed for that purpose by the donee and appeared
for her in the court below. She called upon him with the old
deeds, from which he was instructed to draw two new deeds, in
all respects similar to the old ones saving as to the names of
grantor and grantee, and when he had the deeds ready he was
to attend upon the donor and have them executed. His in-
structions were both limited and explicit. These instructions
he carried out. He was in no sense the adviser of the donor
and at no time acted in that capacity. His only remark to the
donor, as I recall it, was that cited by the vice-chancellor, viz.,
that he reminded her that she had a son. The consequences to
the donor's son of the disposition she was making of her prop-
erty, and her repeated expressions of a desire to provide for him
or his family, are not material, in the present aspect of the
case, save as they throw light upon the donor's lack of knowl-
edge and her need of advice. It may be true, as the vice-chan-
cellor suspects, that if she had known of such a thing as a
spendthrift trust she would have made such a disposition of part
of her estate; it is equally probable that if she had understood
the doctrine of precatory words she might have impressed such
a trust in favor of her son upon the conveyances made to her
daughter—indeed, in a vague way, she seemed to have thought
that she had done so. However well founded in the testimony
these surmises as to the donor's intentions or desires may be,
they do no more than emphasize her need of counsel, not with
respect to the protection of her son, but of herself. The funda-
mental error of the learned vice-chancellor as to the rule to be
applied by him to such a case appears from the concluding
words of his opinion, in which, in summarizing the case before
him, he says: "We are not inquiring whether if Mrs. Telfer
had been properly advised she would have made these convey-
ances. The sole question is, did Mrs. Telfer act voluntarily
and intelligently in making these conveyances, or were they
obtained from her by fraud or undue influence?" This is pre-
cisely the error pointed out in *Slack* v. *Rees,* in the citation
above quoted.

For the reasons there stated, the question considered by the
vice-chancellor as the sole question was not the question upon

which the case turned, while the question that he did not consider was not only an essential inquiry in the cause, but under *Slack* v. *Rees* was absolutely dispositive of it in favor of the appellant.

The decree of the court of chancery will be reversed, and the record remitted with instructions to that court to enter a decree setting aside the conveyances in question.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, FORT, GARRETSON, HENDRICKSON, PITNEY, SWAYZE, REED, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY, DILL—14.