**HOLMES et al. v. CUMMINGS et al.**

**No. 7119.**

Circuit Court of Appeals, Fifth Circuit.

June 9, 1934.

Thos. J. Baten and W. D. Gordon, both of Beaumont, Tex., for appellants.

Roy C. Sewell and W. J. Knight, both of Houston, Tex., for appellee.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

On September 30, 1930, Vincent Walters, a small farmer, died childless, wifeless, and intestate, the owner of 104 acres of land in Montgomery county, Tex., and a small amount of personal property. The estate being in debt, administration was taken out on it. On August 19, 1931, nearly one year after his death, and after more than six months of negotiations by letter for the purchase of her interest, Belle Holmes, one of the ten heirs of Walters, sold to Cummings her one-tenth undivided interest. On December 13, 1931, the Strake wildcat well, the discovery well of the Conroe field, drilling about two miles from this land, came in a producer. On August 9, 1932, Cummings executed a mineral lease on this and the other interests he had bought on a basis of about $4,000 in cash for that interest and the further consideration of $4,000 to be paid him out of one-fourth of the oil over and above the one-eighth royalty. On October 8, 1932, more than two years after her uncle's

death, more than a year after the deed had been executed, and nearly a year after they had known of the oil strike in the Strake well, and to some extent of the subsequent developments, plaintiffs filed this suit at the suggestion of some of the other heirs who had, in the state court, been allowed rescission. The bill, brought to cancel and rescind the deed to Cummings, but recognizing the lease he had made and praying subrogation to his position as lessor, charged that the property had been bought from them for a grossly inadequate consideration through misrepresentation and overreaching. The claim was that Cummings, working with one Crawford, had gone about to obtain the land at a fraction of its value by undue solicitation and false statements; that both, well knowing the statements to be untrue, had falsely represented to plaintiffs, they being ignorant of the facts, and relying on the representations, that the land was of little value, that the estate was indebted, and that, unless plaintiffs sent $18.55, their one-tenth of the estate's unpaid debt, the land would have to be put up for sale. Specifically claiming that in August, 1931, the land had a mineral value of $3 or $4 an acre, and a value for farming purposes of from $5 to $15 an acre, they alleged that the price they received, $5 an acre, was pitifully inadequate for it, and the trade induced by fraud.

The District Judge, in a careful opinion collating and analyzing the evidence, considered and weighed plaintiffs' claims, and pointed out there how far short they fell of making a case. He thought there was no fact misrepresentation, no fraudulent inducement to purchase; that the price paid was not grossly less than at the time and under the circumstances the land was worth; that the discrepancy apparent on the trial between the price paid and its then value was an after effect of the Strake discovery. He found, in short, that no equitable case was made out. He dismissed the bill.

█ This court is of course not bound by the trial court's findings in an equity suit. If, upon a review of the evidence, it reaches contrary conclusions, it may give its own conclusions effect. It will not do so, however, where, as here, the District Judge saw and heard the witnesses, unless clearly convinced that the evidence was not correctly understood, its effect not justly apprehended; unless, in short, the findings appear clearly wrong. We have carefully examined the evidence. We entertain the same view of its effect the District Judge did. It is certainly true that it shows that defendants were desirous of obtaining the property, and that they went about to buy it from appellants. It shows, too, that, as matters have turned out, the appellants have gotten the worst of the trade, but this is all the evidence proves. A reading of it makes it clear that the plaintiffs did not sell ignorantly and without taking advice, nor were they induced by fear or threats, or by misrepresentations on defendants' part. Both plaintiff and her husband testified in person; the husband, who really handled the trade, with particular fullness. His testimony showed not only a considerable general knowledge of, and experience with, wildcatting, and of the difference between before and after valuations in wildcat territory, but a particular knowledge of the fact that prospecting had been going on in the vicinity of this property for many years, and that the deceased had thought the land had oil prospects and at one time had given a lease on it. He did not, however, content himself with the knowledge he had. He made repeated inquiries of the administrator, his brother-in-law, and friend, and when at last, after six months of negotiations he finally agreed to sell, it was not through fear of being sold out, for he was in direct touch with the administrator and knew exactly what was going on. He sold when he thought he had gotten from the buyer all that he would pay, and because he preferred to make the trade to losing the chance of doing so. It is true that in the light of subsequent events he acted mistakenly in selling, but a trade fairly made cannot be rescinded and set aside merely because, through a lucky turn, it has resulted far more favorably for one than the other thought it would.

█ Plaintiffs' case, boiled down, may be simply stated. They owned an undivided interest in a poor piece of land, actually worth some, but not much, more than they got for it, but potentially, with a lucky turn, worth many times more. Satisfied to take cash, they sold their interest for an amount which now appears small. Dissatisfied because the speculation turned out greatly in the buyer's favor, they seek to rue the trade back on allegations of fraud and overreaching which the proof does not sustain. The decree was right because of plaintiffs' failure to prove the case they alleged. It was right, too, for another reason, plaintiffs' delay in seeking rescission.

██ Upon the plainest principles, it is obligatory on one having a right for fraud to rescind to promptly disaffirm upon discovery of it. If, with knowledge of the facts which give him the right to rescind, he does not promptly proceed to do so, though he may still

sue at law for fraud, his right to rescind is lost. Especially is this so where, as here, the property involved is of a speculative nature, and with full knowledge of the facts plaintiff has waited, under changing conditions, to disaffirm. Restatement, Contracts, § 483. The delay here was unreasonable. Though plaintiffs knew shortly after it came in of the Strake discovery well, and in a general way of subsequent developments in that vicinity, and though they were, as Holmes testified, dissatisfied with their trade, they waited for many months to sue; indeed, it was only after Cummings had made an advantageous lease that they sued to get the benefits of it. Even then it was not of their own motion that they sued, but because they had been persuaded to do so by some of the other heirs who had sued for and obtained rescission.

The decree is affirmed.