**KELLAHIN et al. v. HENDERSON et al.***

No. 7725.

Circuit Court of Appeals, Fifth Circuit.

Jan. 14, 1936.

*Rehearing denied March 4, 1936.

Will A. Morriss, of San Antonio, Tex., and K. K. Woodley, of Sabinal, Tex., for appellants.

Ernest W. Clemens, of San Antonio, Tex., and G. B. Fenley, of Uvalde, Tex., for appellees.

Before FOSTER and HUTCHESON, Circuit Judges, and STRUM, District Judge.

HUTCHESON, Circuit Judge.

By deed dated February 6, and bill of sale dated February 13, 1933, each reciting, but each without consideration, Jason W. James, then in his ninetieth year, crippled and senile, and within six months of his death, gave his ranch and live stock away. Bought within the year by first converting into cash $40,000, nearly the whole of his realizable estate, these properties represented nominally nearly two-thirds, really the greater part of what he owned. The donee, Eugenia I. Henderson, was the wife of Robert Henderson, his ranch manager. It was at Henderson's instance and urgence and through his procurement that James had in the previous summer bought the ranch and cattle and installed Henderson as manager. Both Eugenia and Robert Henderson were strangers to James' blood, and, until shortly before the instruments were made, had been almost complete strangers in fact. These instruments were prepared and their execution arranged for

and directed by one Anderson, a lawyer of some sort,[1] long a friend of and lodger with the Hendersons at their hotel in Corpus Christi and, at the time of their drawing, actively engaged in putting Henderson through bankruptcy. Their making was conceived and engineered, and they were prepared and executed, without the benefit of consultation with, and without even the knowledge of, any of James' relations or friends. In fact, except for the witnesses to their execution and the notary who took their acknowledgment, none but Anderson and the Hendersons knew that the matter was going forward or that the transfers would be or were being made.

At the time these instruments were made and signed, James was living with, and was under the complete care and control of, the Hendersons, who, as a part of the contract for management Henderson had gotten James to make, had agreed "to take care of and look after Captain Jason W. James in sickness and in health, so long as Captain Jason W. James may continue to live.[2]

James, a widower for some few years before his death and childless, left surviving him as his next of kin two nieces and the only son of a third niece, then deceased. These nieces, children of his brother William, had been orphaned when very young, and James and his wife had adopted, raised and educated them.[3] Appellants, plaintiffs below, are these next of kin. Appellees, besides the Hendersons, are the executor and one of the beneficiaries in a will executed shortly before his death, now being contested. This will left the balance of his property to Jennie McClenny, one of the nieces and to a remote cousin, leaving the other niece Lily Kellahin and his namesake, Jason Urton, son of his deceased niece, unprovided for except by a general bequest of $1 to all claiming by blood relationship against his estate.[4]

While this will was drawn, not by Anderson, but by Mills, named executor in it, Anderson in the course of his correspondence with James had suggested Mills as the person to go to if James desired any changes made in the deed. From the correspondence it appears too, that Anderson had discussed with James the making of a will, and, in sending James the deed and the affidavit to be made in connection with the transfer, had sent him a "phrase used in many wills."[5]

The suit was in equity against the Hendersons to cancel and set aside the deed and bill of sale for James' legal incompetency to make them and for the fraud and

---

[1] Anderson in a letter referred to himself as "a little (title) lawyer for the past twenty years." Henderson said of him: "He was a title lawyer. I never knew of him practicing in the courts. I suppose he was a lawyer. He was with a guaranty title company and all he did he was working for them. I knew him well."

[2] Or, as James put it in a letter of August 11, 1932, to Bob Kellahin, his foster son-in-law: "I have made a contract with Bob Henderson and wife to care for me in sickness and in health, and to act as my ranch superintendent for ten years. He gets no salary, but shares in the net profits." He wrote the same thing in effect to his niece Jennie.

[3] In his diary, James said of them: "We adopted the three girls, Lily, Jennie and Bessie. We educated Lily at Martin College, Pulaski, Tennessee; Jennie the same place, Bess was educated at Weatherford College."
In a letter written at Roswell, N. M., on December 24, 1919, James said of these nieces: "The Lord gave us no children. We adopted a little boy first and he died with tuberculosis at nine years of age. Then we adopted three little girls, raised and educated them. They married three very good men and are living near us."

[4] This notwithstanding the fact that in 1928 James had made a will appointing Robert Kellahin his sole executor, had remembered the minor children of "his three adopted daughters," and had divided the balance of his property into three shares, one to Robert Kellahin for the use and benefit of his wife and their children, one to Jennie McClenny, and a third to B. W. Urton, husband of Bess, for herself and her children, and in the fall of 1931 had repeated the same will except that he left his property this time directly to the two nieces and to the son of the third niece.
C/f Simon v. Middleton, 51 Tex.Civ. App. 531, 112 S.W. 441, where undue influence was held rebutted by proof that the testator had made previous wills of the same general tenor as the one under attack.

[5] This phrase was: "I desire to be buried and direct that my executor shall have full charge of all arrangements of the funeral." "The above will do away with any wrangling that the relatives may try to set up." (Signed) "A. D. Anderson."

undue influence the Hendersons had practiced. The other defendants were joined as persons named in the contested will, who, having been requested to do so, had declined to sue to avoid the donations. Neither the donee nor her husband were called as witnesses. Anderson, their lawyer, who had confected the instruments, was not called, nor was any explanation of their conceiving and execution attempted to be made by defendants. Many witnesses who had known James for a long time before his death, including his family physician, his housekeeper, his neighbors, and his friends, were called by plaintiffs. These testified to his having apparently undergone great degenerative changes in the last two years of his life. It was proved without contradiction, that he died of chronic nephritis or Bright's disease, and that "in an elderly person this is always associated with arteriosclerosis, and not only involves the kidneys, but the brain as well causing degenerative changes there." Plaintiffs' neighbor witnesses gave it as their opinion that James was not sufficiently at himself the last two years of his life to be capable of understanding the effect and consequences of what he was doing. Their medical witnesses testified that, while he had mentality enough to understand and do a specific act or thing, he did not have the mentality to understand and appreciate the nature and significance and the consequences of it.

Defendants, to prove sanity and competence, offered the testimony of some thirteen witnesses. All of these were from the vicinity of the ranch. None of them had known James for more than a year before his death. They offered, too, the expert opinion of a physician that, upon the hypothesis defendants put to him, James was sane and competent. No witness testified that James had before their execution ever spoken of his intention to make the deed or bill of sale. No witness but one, and he the notary who took the acknowledgment, testified that James spoke of intending to make the deed or of having made it.[6] Henderson with his wife and Anderson had taken him to get the deed signed. The signing of the bill of sale was accomplished by Henderson taking him to town alone.

No witness testified that James ever spoke of having deeded away his ranch and cattle, or that he spoke in a way which would indicate that he knew that he had done so. On the contrary, defendants' witnesses testified that he always spoke of and treated the place as his ranch; always referred to Henderson as his manager. One of defendants' witnesses, King, who testified willingly and with freedom for defendants, after stating that on December 4, when Mrs. Henderson had left the room where they were sitting, James said: "I am very comfortable. That is certainly a fine woman. She takes better care of me than anyone could"—detailed conversations he had had with James in the spring following, after, of course, James had deeded ranch and cattle away.[7] Though Henderson had in August obtained from James what on its face appears to be an unconscionable contract,[8] upon no consideration at all except his agreeing to

---

[6] The notary said: "Mr. Anderson brought him in and was sitting or standing there by him. The Captain said he was getting a life equity by the deed. There was nothing said about how much he was getting paid. So far as I know he did not consult anybody except Anderson or Henderson."

[7] "The next spring I was over there and we talked quite a bit about the cattle, and he told me about Mr. Henderson, how he was taking care of the stuff and how well he was taking care of them, and finally went on to say, 'Well he has taken so much better care of them than he could have got somebody else he tried to get to do something for him.'" "He said if these folks had taken care of him like he wanted to be, he would have turned quite a bit of this property over to them. So then he indicated he was going to compensate Mr. Henderson very substantially for what he was doing, and that he would

have done this for those other people if they had not been so contrary." "Another time he and Mr. Henderson and myself were out in the pasture there at the ranch. When Mr. Henderson left Captain James he said: 'Henderson certainly does look after the stuff. He is the best man I could have got to have done this work for me. He looks after it better than anybody I could have got.'"

[8] That is, an agreement that James would buy and stock and run at his own expense a ranch, making Henderson the manager, giving him one-half of the profits, burdening the ranch with a $10,000 preference claim in Henderson's favor in case of its sale or devolution to the heirs, upon no consideration except Henderson's agreement to manage it and to take care of James during his life, not however, in Henderson's home and at Henderson's expense, but in James' home and at James' expense.

manage the ranch, bought and stocked at James' expense, and to look after James for the rest of his days, neither the deed nor the bill of sale which stripped James of both ranch and cattle, except for a life estate, made any reference to this contract, or any provision for taking care of him.

The District Judge found with defendants on the issues of sanity and competence. He found with them too, that no fraud, no undue influence, had been shown, but that the evidence showed that James knew fully what he was doing when he voluntarily stripped himself of his property to give it away. This appeal is from the decree dismissing plaintiffs' bill and quieting title in defendant Eugenia Henderson to the land and cattle.

Extensive findings of fact and of law were filed; some of these are general, some specific. Appellants admit that the general finding that James executed the deed and bill of sale while sane and competent and as his free and voluntary act, uninduced by fraud, undue influence, or unconscionable dealings, does of course support the legal conclusion that they should not be set aside. They urge upon us that this general finding is not supported by the special findings on which it is supposed to rest, and that the special findings are without support in the evidence. To appellees' insistence that we must attach great, if not conclusive weight to the District Judge's findings of fact, appellants oppose the views announced by this court in Holmes v. Cummings, 71 F.(2d) 364, 365: "This court is of course not bound by the trial court's findings in an equity suit. If, upon a review of the evidence, it reaches contrary conclusions, it may give its own conclusions effect. It will not do so, however, where, as here, the District Judge saw and heard the witnesses, unless clearly convinced that the evidence was not correctly understood, its effect not justly apprehended; unless, in short, the findings appear clearly wrong."

They insist that the special findings are partial and incomplete, and are not only unsupported by the evidence, but are inconsistent in themselves. They point particularly to the seventh finding, that the deeding of the ranch property and the disinherison of Lily Kellahin was a natural act, explainable by the prejudice James took against Bob Kellahin, because of his failure to pay the debt he owed and settle with James for the building and loan stock.

They insist that this is not so; that this act of disinherison of Mrs. Kellahin, his devoted foster daughter, while making Mrs. Henderson, a stranger, the subject of his bounty, can only be explained by the existence of a state of senile dementia and the influence of Anderson's inspired attacks on Kellahin. They point to the fact that, until Anderson appeared, James' relations with Kellahin had been of the best, and that, if Kellahin was slow in paying, Henderson, Anderson's confederate and ally, had borrowed $1,500 of James without security, and was just then through Anderson canceling the debt in bankruptcy. They ask further that, if it could be assumed that James' turning against Kellahin was natural and not an evidence of undue influence, what is there to explain or justify his turning against and disinheriting Jason Urton, the minor child of his other niece, against whom nothing existed or could exist for even designing malevolence to take hold of? They complain of the eighth finding, that James voluntarily, and with full understanding, entered into the contract of August 6 with Henderson, that it was made without a syllable of evidence in the record as to the circumstances under which the contract was made, who prepared it, or how it was induced. They insist that there is positive evidence to the contrary in the oppressive nature of the $10,000 charge in the contract and in James' letters to his niece and his foster son-in-law, in which he describes the contract as one in which Henderson has no salary and must look alone to the profits, apparently neither knowing nor understanding that, in addition to all the other benefits, the contract fixed a charge of $10,000 on his property.

Of that part of the eighth finding in which it is said, "When James came to Texas and started in upon the venture, he experienced a kind of mental exaltation which made him extremely happy," appellants in effect say, no doubt he did. It was not however, the exaltation of a serene and steady mind, a quiet and unperturbed will. It was the exaltation of hallucination, the delusion of vigor, power, and importance regained brought about and fed by flattery and designing attentions, in scenes which brought back his youth. Attentions which, producing a kind of fevered Indian summer of the mind, caused it, before flickering out, to flare and burn with an unnatural, a consuming flame. They say, however, that the root

and seat of the error in the findings and in the decree is to be found in the finding of law "That at the time the instruments were made Mr. and Mrs. Henderson were not in a fiduciary relationship with the grantor as to their execution and delivery, as they were made by James in the nature of gifts and not as the result of negotiations carried on between the parties or a trade made by them." They say that this finding and an apparently contradictory one, that, "although the deed and bill of sale were in the nature of gifts, and not as the result of trade or negotiations, they were more than gifts, as they were supported by the consideration of the $10,000 charge of the August 6 contract, of which he was deprived when he in effect waived and surrendered it by the acceptance by his wife of the deed and bill of sale explained" constitute the fundamental error of the decree. They argue that there is nothing in the evidence that Henderson waived anything or accepted anything; that, silent and secret as the grave which seven months later received James, Henderson and Anderson sat throughout this trial, offering no explanation of the transaction, furnishing no testimony that Henderson had waived or agreed to do anything about the contract or his rights and obligations under it.[9] Plaintiffs did offer, from Henderson's testimony in the will contest, his statement made in explanation of why James continued after the bill of sale to handle the cattle and settle for them on the basis of the contract.[10]

Appellants insist that these findings, which in effect go upon the idea that plaintiffs had a heavy burden to undo the documents by direct evidence of overreaching, defendants none to sustain them, are greatly erroneous and caused the erroneous decree. They argue that not plaintiffs, but defendants, had the burden to show the full nature and character of the transactions they had with James. They urge that at the time the deed and bill of sale were executed James was in the complete and absolute power, under the complete and absolute domination and control, of the Hendersons, and they stood to him in a fiduciary relation of the most compelling

kind. They insist that, as the record stood, the burden was upon the Hendersons to show that the making of the transfers was not the result and a part of a deep-laid far-looking scheme to obtain the ranch, particularly was it upon them to show that Anderson had not, ostensibly as James' lawyer, but really as Henderson's, been brought forward when the time was ripe to bring the plan to fruition. Appellants further insist that, as the record stands, it reveals a studied plan and cunningly contrived chain of circumstances, designed to put and putting the will of James in vinculis. They argue that these circumstances show fraud and overreaching, through blandishments, flattery, and cajolery begun by the Hendersons and pushed to an effective conclusion by the insinuating artifice of Anderson, who, appearing in the nick of time, fastened himself upon James as his attorney. They insist that spoliations of this kind, so designed and conducted as that no one knew, until James' death, but the Hendersons and Anderson, what was done, and they keep silent, are not required to be proven by direct; they may, they must be, proven by circumstantial evidence. They urge especially that this is not a common-law action, requiring plaintiffs to make direct proof of fraud and undue influence. It is an equitable one against persons who sustain and have profited by the closest, the most confidential, relation to the person and property of an old and stricken man. They insist that the burden rested upon defendants more heavily than they could bear to show that, in taking the transfers of his property, they did not despoil him, and it was for that they kept silent.

We agree with appellants that the Hendersons were in a fiduciary relation to James. We agree that, instead of plaintiffs having been put to and having failed in their proof, it is the defendants who, charged in the strictest way with explaining and justifying what on its bare statement appears a confidence game, have utterly failed to do so. We think, too, that, if plaintiffs were under any burden, they have fully sustained it. What they have proven, no explanation of it appearing,

---

[9] They say that, if taking the deed and bill of sale did cancel the contract, then the overreaching of James by the execution of the deed and bill of sale was still more egregious, for these instruments stripped him at once of his property and

of Henderson's agreement to look after him until death.

[10] "He reserved the right to handle the cattle and the agreement and the contract went ahead just the same."

shows the conception of a scheme to defraud and obtain money and property by false pretenses and its bringing to fruition by sustained and secret methods. It shows a formed design, and a fixed purpose to overreach, entered upon by its beneficiaries and perpetrators, in the confidence that James' extreme old age and advanced state of decrepitude would make him compliant to their ends, and carried out with the fell swiftness and success their careful planning assured. A statement of the facts, without color or comment, will, we think, make this inescapably plain.

In 1931 James, long years before a ranchman, but now for many years retired, was living in Roswell, N. M. His wife had died some years before, and living near him and looking after him were his three foster daughters, whom and their husbands he loved and trusted and who loved him as his children. In the summer of that year he stayed three weeks at a hotel in Corpus Christi, run by Henderson and wife; Henderson being then insolvent and heavily indebted. Except his statement to his housekeeper that he went there for the sea air, the record does not show what caused James to go there. It shows that many years before he had known Henderson slightly and for a brief period. This slight acquaintance was not kept up. No correspondence had been exchanged between them from that time on; Henderson in his testimony given in the will case, stating that he was surprised when James came to

his hotel. During James' stay there, Henderson talked a great deal to him about ranching, telling him of a plan he had to trade his hotel for a ranch and go back into the ranching business, Henderson having for a short time, at an earlier period, worked on or had a ranch. These discussions and the thought of ranch life greatly interested and excited the old man. Both the chauffeur and the housekeeper he had before the Hendersons took possession of him testified to this. They say that, after James came back to Roswell, all he could think and talk about was Henderson's going into the ranching business. Though none of his letters have come to light, the housekeeper testified and the record shows that Henderson wrote James often during the fall and winter of 1931 and 1932. Their nature may be surmised, however, from the housekeeper's testimony that on one occasion James told her Henderson had written that James could live with him on the ranch Henderson was going to buy without expense for as long as James wanted to. On another occasion, after reading one of his letters, James said to her, "Poor Bob, he thinks I am his daddy." What the correspondence was about and the whole scheme of Henderson is, however, made abundantly clear by the letters from James to Henderson the defendants offered in evidence. These letters, beginning in January, 1932, and concluding in April,[11] show that Henderson had been writing James about his efforts to exchange

---

[11] On January 14 James wrote:

"Dear Bob: I feel interested in your exchange of property. I would like to go down and look the place over if you get it and consult with you about stocking it. How soon do you expect you can complete the deal and get possession? Of course you expect to live on the ranch. I have $2500 idle now I could use in an emergency should you find a bargain in some cows. I will wait anxiously for an answer to this letter. I wish you would send me a map of Texas and mark on it where the land lies."

On January 23 he wrote again:

"Dear Bob; Yours of the 20th just to hand. You said you wanted to be sure that you are right. That pleases me. It would be well for you to look the ranch over before closing the deal. This winter here has been cold. I do not feel now like I will want to spend another winter here. I would exchange my home for good pasture land if I could get it at a price that would pay interest. If I could get five or six sections close to you

I would give my place and the difference in cash."

On February 15 he wrote:

"I have thought a good deal about your prospective exchange of property. I hope you can make the deal. If two or three thousand dollars will help you close it take an option for it and I will try to raise it. I had a ranch 100 miles west of Del Rio in 1883 and 1884 and lived in a tent. My legs are still weak and my eyes have failed a good deal in the last few months. I cannot help speculating in my mind what a live man can do on that ranch. If you get it I expect to spend some of my time with you. I have been thinking of the squirrels I will find up those pecan trees, and the ducks in the river during the winter."

On February 24 he wrote:

"Your telegram of the 23rd (one asking for $1500 on the deal) to hand this morning. I am glad you have gone into the contract. I think well of the place. When I get down I will want to stay for some time. I feel you will want to

his hotel and his desire to obtain a ranch, and these letters and the testimony of the housekeeper show that, as the plan was first put to James, Henderson was to buy the ranch, James was to lend him some money to help stock it, and Henderson was to let James live with him as long as he desired without expense. This is what Henderson was telling James the plan was. How different it really was the sequel shows.

Shortly after this last letter was written, James went to Corpus Christi, and from that time on, as far as the record shows, never again had the benefit of association or counsel with his family or friends, was never out of the sight or presence of the Hendersons or of some one acting for them. Once only he came back to Roswell, but this was only for a day and in the care and keeping of Henderson's son-in-law, who drove him there and back. After he got to Corpus Christi, the ranch project developed from a purchase by Henderson to a purchase by James, and resulted in James buying the particular ranch Henderson had long had his eye on. Having gotten James to buy the ranch as a first step, Henderson next got him into a contract, ostensibly one for ten years' management of the ranch, but in reality charging the ranch with $10,000 in favor of Henderson, giving him one-half of the net proceeds of all sales over expenses and all of the increase of the cattle on the ranch at the expiration of the agreement over and above the number originally put there by James.[12] Until he went on the ranch in September of 1932, James continued most fond of his nieces and their families.. He wrote Bob Kellahin, his foster son-in-law, who had long managed matters for him, that he wanted Bob to have his house in Phœnix, Ariz. Upon Kellahin's writing back declining it, on the ground that he had not done anything for James to deserve such a gift, James wrote him in the most affectionate terms unsuccessfully reurging the gift on him. To one of his nieces he wrote urging upon her his home in New Mexico, telling her he had made up his mind to stay with the Hendersons and that they had agreed to take care of him for the balance of his days. The ranch was bought, the cattle purchased, and in September the Hendersons, his wife and James, moved in. Then in November the actual consummation of the plan to get the ranch and cattle from James was begun. This requiring another actor; Anderson, described as a title lawyer and not in active practice, appeared upon the scene. He had lived for many years at Corpus Christi, part of the time in Henderson's hotel, but was now in Dallas. Called to the ranch ostensibly to prepare bankruptcy schedules and put Henderson

---

buy cows as soon as you can. In 1883 and 1884 I ranched 100 miles west of Del Rio on the Rio Grande. I think after you give me notice it will take me five days to get to Uvalde."

On April 1 he wrote:

"Dear Bob; Yours of the 29th has reached me. I had become discouraged about your making the deal. I think now that your deal will go through. I am going to work to collect money to stock the ranch with cattle. Besides helping you I feel I am helping myself. The elevation here is too high, and I must hunt a lower level and think that ranch will be ideal. I like country life best. I hope Mrs. Henderson will soon be up."

On April 11 he wrote:

"Dear Bob; Your letter of the 8th has just come to hand and I have enjoyed reading it. Your idea of running that ranch is mine too. We can live at home and live well. I am tired of town life. When you move up you can notify me where to meet you. Keep a lookout for some cows such as you wish. I am glad Mrs. Henderson continues to improve. My wants are not very many. Do not go to any extra trouble to fix things for me."

[12] This contract obligated James to stock the land with cows, horses, and implements and fix up the ranch fences. It appointed Henderson superintendent of the ranch for ten years; obligated James to pay all the expenses of the ranch without interest; agreed to pay James back out of the sale of cattle the expenses he had paid; provided as a definite part of the consideration an agreement that Henderson was to take care of and look after James in sickness and in health so long as he should live, James however, to be responsible for all medical and hospital bills; gave Henderson the option of buying the ranch for $10,000 less than any person could buy it, obligated James to pay Henderson $10,000 if sold and James' heirs to pay him that sum if they took it over. At the expiration of the agreement, Henderson is to have the sale of all live stock over and above the original stocking. The tenth clause provided: "This contract can be dissolved at any time by mutual agreement."

through bankruptcy, and coming there, as Henderson said at his own expense and without pay, expecting, of course, to get it in the future, on the first day of the first visit Anderson had up with James the matter of his deeding the ranch. From that time on Anderson rested not, nor turned away until the documents were signed. Because neither Anderson nor the Hendersons took the stand and none of the conversations had about the deed or the bill of sale were in the presence of any one, the record is largely silent as to the genesis and progress, and only meagerly explanatory as to the consummation of the efforts to obtain them. We know, however, from letters in the record, that at that time Anderson commenced a studied course of disparagement of Robert Kellahin, James' former trusted adviser, who owed James $1,000 and in whose building and loan association James had $12,000 of stock. James had before that time been trying to get the stock redeemed under an agreement he had with Kellahin, but, though unsuccessful, because of hard times and the pecuniary condition of the loan company, apparently before Anderson appeared no hard feelings had arisen. After that, however, there was talk only of suing Kellahin, of Kellahin having swindled and overreached James, with the result that Kellahin became in James' mind what Anderson in a letter to James called him, a "regular Dr. Jyckle and Hyde." It is significant to note that, while this talk of suing Kellahin was going on, Anderson was not advising James to sue Henderson for the $1,500 he had borrowed, but was, as Henderson's lawyer, preparing his schedules to cancel and discharge the debt. We know, too, from Anderson's letters of November 5th and 7th, that the deeding was discussed with James as a way to avoid inheritance taxes.[13]

In February the deed and bill of sale were executed. Anderson, in Henderson's words, "had James alone the day before." Then he, Mr. and Mrs. Henderson, and James going to the town of Uvalde, and the Hendersons retiring from the room, James signed and acknowledged the deed, Anderson standing or sitting by. That same day Anderson signed and procured the signing of an affidavit he had prepared in advance as to James' competency and soundness of mind. The bill of sale, though prepared by Anderson, was executed under Henderson's auspices and on Anderson's advice in another small town so as to get other affidavits of competence. After these papers were signed, nothing was said or done by any one about them until James' death. The cattle dealings, the management, the division of profits went on as before.[14] James got feebler and feebler, finally had to go to a hospital. About a month after he came back, and seven months after he had signed the gift papers, he died.

It is difficult, we think, to imagine a fiduciary relation to James more certain,

---

[13] On November 5 Anderson wrote James:

"It was like returning from a vacation after spending the happy day on the ranch. * * * I want to again thank you for the homelike courtesy that I received at the ranch and will write you in a couple of days on matters which he discussed. With kindest personal regards to the happy trio on the James' Ranch."

On November 17 he wrote:

"I take the pleasure in submitting you a sample copy of the deed which will offset the inheritance tax which we discussed while in your home, and wish to call your attention to a specification in this deed such as the consideration. You will notice that I have added" And other valuable considerations. "This phrase will take care of any contract that you may now have or will have with Mr. Henderson regarding certain duties that he must perform in your behalf during your natural life. * * * Now Captain, every lawyer differs as to the phraseology of the instrument and I am simply submitting this from my experiences as a little attorney for the past twenty years. In a few days I will send you the actual figures on the inheritance taxes, both National and State, for your information."

On January 9, 1933, he wrote:

"I am enclosing a deed, affidavit and a phrase that I find in many wills * * * All you have to do is look out of the front window on a sunshine day and you will see no imaginary scenery but the contentment of those wonderful white faces looking home. I many times wished we the human folks could look and act so contented, for after all it is the *greed* that makes us discontented and *mean.*"

[14] Notwithstanding this and the fact that by even the instruments James had a life interest in the land and cattle, in two inventories of James' assets, one March 17, 1933, and May 1, 1933, neither ranch nor cattle were listed. Neither who prepared these nor the circumstances of their preparing appears. The March inventory lists Henderson's $1,500 note; the May inventory leaves it out.

more precise, more compelling than the one the Hendersons were in when by the deeds of gift they got his ranch and cattle. They had taken the old man under a contract, to look after him until his death, a contract making Henderson the complete and sole manager of the place. Crippled and on crutches, James could not get about without assistance. Henderson helped him on his horse, and went about the ranch with him, and Mrs. Henderson helped and looked after him in the ranch house. They had thus made themselves almost indispensable. They were thus in the most favorable position to effectively wield in their own favor the great influence they had. It is hard to imagine a situation where any influence they exercised in their own favor would not be undue. Exercised, as here, to strip him of his ranch, it was bound to be. On this record, it will not do to say, as appellees do that James had the independent advice of Anderson as his lawyer. The record permits no other reasonable conclusion than that, though he came there ostensibly to, and he did, represent Henderson in the bankruptcy proceedings, he came there too, and returned there often, to bring about, in Henderson's interest, the execution of the deed. This is the only conclusion to be drawn from his acts before and at the time the deeds were given, his silence since. As the record stands, Anderson silent, the only reasonable inference to be drawn is that he represented Henderson throughout and was looking far ahead for his pay. The preparation and signing of affidavits, the constant vigorous poisoning of James' mind against Kellahin, his failure to warn James against Henderson, who was at that very time canceling a debt he owed James, speaks only one thing, that Anderson was Henderson's lawyer, not James'. It is said that no inference can be drawn from the failure of the Hendersons to testify because they were disqualified by the Texas statutes from doing so. But Anderson was under no disqualification. He was present at Henderson's instance, attending the trial. It was his and their duty to disclose through him from whom and how the suggestion came for the deeds to Henderson. His and their duty to disclose through him freely the circumstances of his first coming to the ranch and so soon becoming James' attorney, for them and him to disclose in whose interest it was that he drew these papers and procured their execution. The record is replete with acts which compel the conclusion that Henderson went about from the beginning to, and did, encompass the old man to despoil him of his land and goods. Some of these are his borrowing $1,500 from him without security while insolvent and, as evidenced by its discharge in bankruptcy, without intention to repay it; his trying, while posing as James' friend and counselor in buying the ranch, to have the sale price loaded with a commission he could split; his obtaining without, as far as the record shows, James being independently advised, first the unconscionable management contract, and then the deed and bill of sale, and finally Anderson's bringing in to pose as James' attorney, his actions and silence since.

Appellants urge upon us that the trial court erred, too, in finding that James was of sound mind and competent to make the transfers. They say this finding is in the face of the evidence of his regular physician, of the physician who examined him at the hospital shortly before his death, of the superintendent of the San Antonio State Hospital for the insane that he was suffering from senile dementia, and of those who had known him for years. This finding, they say, is in the face of the fact that, notwithstanding he had given a bill of sale to Mrs. Henderson, James continued to sell the cattle as if they were his own; in the face of the fact that, though he had charged the ranch with $10,000 in favor of Henderson from the day the contract was signed, he wrote his niece that Henderson was working for him without salary and without compensation except the profits from the sale of stock. They insist, finally, that, if notwithstanding all this evidence it might not be said of a normal, a usual thing he had done that he did not have the mind to do it, the very fact of the strangeness and the enormity of this transaction is proof of lack of competency. We do not find it necessary to determine this, for it is quite plain that, if James had the competency to understand what he did, it was not his will that did it, but the will of others who had his will in chains. Within less than a year, in fact, within five months, what had been tenderness and affection for and confidence in Robert Kellahin was turned to suspicion and resentment; what had been tenderest sentiment for Lily, his niece, as shown by his letters earlier in the year, was turned in the fall to neglect and indifference; what was affection and willingness to

secure by his bounty, as evidenced by the two wills he had made in 1928 and 1931, was turned, within less than four months, to neglect and indifference, in fact, to complete forgetfulness of his namesake, the minor child of his deceased niece. What he did was not natural; it was not uninfluenced; it was not what he willed.

It is true that the books say influence alone will not defeat a transaction, but only that which is undue. It is true that no influence is undue which does not put the will in chains. It is true, too, that in matters of the disposition of property one may do what he wills with his own. But it is likewise true that it must be what he wills, and not what some other wills through him by the practice of artifice and fraud. In all the books we venture to say no more egregious case of overreaching than this can be found. Here a senile crippled afflicted old man, whose mind, though in it the light of intelligence indeed still burned, was yet no longer the obedient servant of his own will, but the ready servant of the will of others, has been made the victim of what, on the record we have, appears to have been a deliberate confidence scheme, a scheme which has been successful because no one having his interest at heart has been permitted to be around him while it was going forward, and now, when his lips are sealed in death, the circumstances of its doing are known only to the perpetrators, and they keep silence. Nowhere in the books has there been found, nor, we think, can be, a case of close designs and crooked counsels like these appear to be, which have prevailed. It is not essential to its overturning, in the view we take, that there are others justly entitled to James' bounty, whom the scheme, if successful, would deprive of it. If he were childless and without heirs, the transaction, if fraudulent as to him, could not stand to benefit its devisers. But it is greatly material that there are persons, his adopted children, as close to him, perhaps, as his own would have been. Their existence, and the affection he had for them, makes it abundantly clear that the change that came over the spirit of his dreams in the last year of his life was, if a natural change and uninspired, that kind of naturalness which is senile dementia, when friends become foes, and foes, friends, and design and artifice come into their own. If it was unnatural and inspired, it was inspired by Henderson and Anderson in order to more easily accomplish their designs.

Each case of this kind rests, of course, and must be decided, upon its own facts, but the following authorities as well as many others not cited, support the conclusion we have reached: Pomeroy Equity (3d Ed.) §§ 944, 955–957; 28 R.C.L. p. 90; 28 R.C.L. p. 142; 28 R.C.L. §§ 99, 100, pp. 145, 146; Post v. Hagan, 71 N.J. Eq. 234, 65 A. 1026, 124 Am.St.Rep. 997; Zeigler v. Coffin, 219 Ala. 586, 123 So. 22, 63 A.L.R. 942; Raney v. Raney, 216 Ala. 30, 112 So. 313; Coghill v. Kennedy, 119 Ala. 641, 24 So. 459, 468; In re Adam's Estate, 220 Pa. 531, 69 A. 989, 123 Am. St.Rep. 721; Allore v. Jewell, 94 U.S. 506, 24 L.Ed. 260; Thaw v. Thaw (C.C.A.) 27 F.(2d) 729; Floyd v. Floyd (C.C.A.) 11 F.(2d) 841; Crabb v. Watts (D.C.) 249 F. 357.

The judgment is reversed, and the cause is remanded for further proceedings not inconsistent herewith.

Reversed and remanded.