## TAYLOR et al. v. TAYLOR.

### No. 14480.

Court of Civil Appeals of Texas.
Dallas.

May 2, 1952.

Ross Huffmaster and Jess Rickman, both ·of Kaufman, for appellants.

Monroe Ashworth and A. G. Henry, both of Kaufman, for appellee.

BOND, Chief Justice.

This is a will contest. Agnes Taylor, surviving wife of testator John Marion Taylor, filed application in the Probate Court of Kaufman County, Texas, to probate the will of her husband. Robert Taylor and others (children of the deceased testator· by a former marriage) contested the application on the grounds: (1) Mental incapacity of the testator; (2) undue influence exerted by Agnes Taylor over the testator as to cause him to execute the will; and (3) the will offered for probate had been revoked by subsequent will in form of deed executed by the testator. On hearing, the County Court probated the will; the contestants appealed to the District Court of Kaufman County.

In the District Court, over the contestants' exceptions and motion for peremptory instruction, the cause was submitted to a jury on the single submitted issue as to whether the testator "did not have testamentary capacity to execute the will." And on an affirmative finding, the court entered judgment admitting the will to probate.

To the action of the court in submitting the issue as to mental capacity and failure to submit special issues as requested on undue influence and revocation of the will and to the findings of the trial court in its judgment, (1) that the will of John Marion Taylor was executed with all the formalities and solemnities required by law to make it a valid will and that it had not been revoked; and (2) that the contestants failed to establish by competent evidence that "the testator was under or subject to undue influence in the making of such will," the contestants duly excepted, and with other assignments hereinafter considered assigned respective errors and duly perfected appeal.

In briefs appellants make seven points of error, none of which challenge the insufficiency of the evidence as to the issue of mental capacity of the testator to make the will, and no point raised as to the "negative" form in which the issue

of mental capacity was submitted. The burden being upon the appellee proponent in offering the will for probate to establish affirmatively that the purported will was executed with all the prerequisites, formalities and solemnities required by law and that the testator was of sound mind at the time of executing the will. The evidence as to the soundness of mind of the testator was sharply controverted, and as the cause must be reversed and remanded, on another trial the issue of the mental capacity of the testator should be so framed as to call for an "affirmative" finding rather than "negative" by the jury, as to avoid error in submission.

The uncontroverted evidence established the following facts which have bearing on the issue of "undue influence": John Marion Taylor, deceased, was an old man, 75 or 80 years of age; could neither read nor write and was neither strong mentally nor physically; had been twice married and had two sets of children. The contestants (four in number) are children of the first marriage; Agnes Taylor, proponent of the will, was his second wife and to this marriage the residue beneficiaries named in his will are their children. In 1945 John Marion Taylor and his wife Agnes Taylor executed a joint will (the will in controversy) in which each willed to the other in similar and effective terms all property which the one predeceasing shall own and possess at the time of his or her death, to sell and dispose of and to make use and enjoy and to have absolute control of for and during the life of the survivor and at death the residue vest in their last four children in fee simple, to wit: Marion Agnes Taylor, J. B. Taylor, Opal Taylor and Lonnie Homer Taylor, share and share alike forever.

On July 12, 1949 John Marion Taylor died, leaving surviving his said wife Agnes Taylor and his two sets of children. His estate consisted principally of about 142 acres of land valued at approximately $5,000 and some personal property.

There is evidence in the record that Mr. Taylor in 1939 had a surgical operation which caused him to become feeble in mind and body, unable to attend to his business; absent minded, unable to get about, depending upon his wife in the transaction of his business affairs. A Mr. Crum (nephew of Mr. Taylor) testified that prior to the operation his uncle was a very healthy man, worked hard, took care of his farm, but after his operation he was "in pretty bad shape,"—that he considered him in "terribly bad shape"; that he was feeble, at times suffered so badly that he could not recognize him (Crum); he hardly had a well moment, suffering all the time; couldn't attend to business and that his wife Agnes acted as his guardian and when he didn't know what he was doing, she was supposed to do it. A Mr. John Taylor (not related to the parties) gave evidence that he had known the deceased about 50 years and up to a few years before his death he was a very active man, took good care of his business and transacted all of his business affairs; but for the past few years his wife transacted his business for him; that they would come into his place of business and his wife gave orders for what they wanted. W. T. Dykes testified that after Mr. Taylor's operation in 1939, Mr. Taylor got very feeble; told him at one time that if it wasn't for "my wife and family getting around and tending to business, I couldn't make it. I am getting too old to get around to attend to business. I couldn't possibly attend to it if it wasn't for having help from my wife and family." A Mr. I. D. Buie testified that about 10 years ago Agnes Taylor called to Mr. Taylor and made him help do some work laid out for him to do; at that time he observed that Mr. Taylor had become "kind of down and out," weaker after his operation, and that Agnes attended to his business. A Mr. Harris gave pretty much the same testimony as did Mr. Buie, and so did a Mr. Ed O'Brian. Mr. O'Brian further stated that in talking to Mr. Taylor, "he would change the subject from one thing to another, kind of childish like, something like that." A Mr. Travis Prater testified that he had known Mr. Taylor 30 or 35 years; had conversations with him at different times and places, and when he

talked with him he would look up and say, "I ought to know your name. What's your name?" that he would tell him, and he would talk, and directly he would come back and say, "What did you say your name was?" That sometimes he would recognize him and sometimes he didn't. The witness testified that on one occasion he asked Mr. Taylor, "You are pretty old to be out every night, aren't you?" and he said, "Yea, pretty old, but I come to please the folks." A Mr. J. E. Dykes testified substantially as did the above witnesses as to Mr. Taylor's health, and in addition related that he had known Mr. Taylor more than 39 years and on one occasion Mr. Taylor commenced talking about a will; said his folks had been after him to make a will but he had no mind of doing it yet awhile; that Agnes had been after him to make a will, and he said: "I have had my ups and downs in my family like you and a good many others, but I still care for my first crop of children same as anyone else and I don't know whether I know too much about writing out a will if I was a mind to do so," and he "asked me if I knew anything about it. He said he wasn't of a mind to make the will out and wasn't going to so long as he stayed in the mind he was then in. He said he wasn't going to." On cross examination the witness testified: "At the time he was talking to me I didn't think he was capable of making out a will. I guess he knew what he was talking about, but I didn't think he had a balanced mind." Myrtle Taylor testified that on occasions when she was at her grandfather's (Mr. Taylor's) house, she heard Agnes tell her grandfather to come back in the house, that she was taking care of things like that; that Agnes told him if he didn't, she would make him, using profane language when talking; that she told him to shut up his damned old mouth; one thing she told him was that he wasn't boss of the kids, that she was, and she didn't want him to boss them. Prudy Taylor testified that she was present when Mr. Taylor died, and just before his death she heard Agnes Taylor say if that old (using vulgar language not necessary to repeat), was going to die,

she wished he would hurry and get over it, she was tired of fooling with him.

The record evidence further shows that subsequent to the execution of the will in question, Mr. Taylor executed a deed to his wife, Agnes Taylor, to the 142 acres of land, reciting "To pass title at my death, * * * effective at my death * * * but I do hereby retain full control and use of said property described above during my lifetime including all bonuses, rents and rentals on or from same, with the authority to rent or lease as I see fit." The deed was executed in the presence of, and witnessed by, Mr. J. C. Gibbs and Eunice Pearson at the request of the grantor. Mr. Gibbs testified: "The day they (Mr. and Mrs. Taylor) did come in about 30 minutes early and asked me if he could talk a little and went into detail about how he wanted it (the deed) written. Mrs. Taylor was not present for 30 minutes. He left and they came back about 30 minutes later." The deed was executed on April 6, 1949, filed for record on April 8, 1949; and Mr. Taylor died July 12, 1949, and the application to probate the will was filed by his wife on July 14, 1949.

■■ The mental and physical capacity of the deceased testator is to be considered in determining the degree of influence as to vitiate his will. Hart v. Hart, Tex.Civ.App., 110 S.W. 91. While mental condition might have been such that left untrammeled the testamentary capacity of the testator, nevertheless, considering that he was then, and had been for a long time, feeble in mind and in health, and laboring under mental depression, it is but reasonable to suppose that he could have been much more readily influenced unduly than if he had been in good health and possessed of a vigorous intellect. Brown v. Pridgen, 56 Tex. 124. "Where it appears that the proponent took an active part in securing the execution of the propounded instrument, and other indicia of imposition or undue influence are disclosed by the evidence, a presumption arises in favor of the contestant; and refusal on the part of the trial court to submit the issue as to undue influence is

ground for reversal." 44 Tex.Jur. 598, sec. 56.

■ Where as in the case here, the proponent was present when the joint will was executed, and each signed the will at the same time and the same witnesses subscribed their names, with all the facts and circumstances in evidence, necessarily excites scrutiny which required the proponent to explain, or refute the evidence given against her. Silence under the circumstances is of probate force on the issues, both of soundness of mind and of undue influence on the testator exerted by the proponent of the will. "* * * whether or not undue influence has been exerted by an interested beneficiary must usually be established largely by circumstances." Russell v. Boyles, Tex.Civ.App., 29 S.W.2d 891, 892. We are of the opinion that the issue of undue influence should have been submitted.

Furthermore, the contestants assign error to the action of the trial court in sustaining the proponent's objection to the proffered testimony of Mrs. Robert Taylor, wife of one of the contestants; also that of A. W. Smith and James Taylor, as to statements and acts of the proponent, Agnes Taylor. Mrs. Robert Taylor would have testified: "Sometime during the year 1941 she and her husband and their daughter were down to the home of her husband's father, Marion Taylor, and that Agnes Taylor was also present at the time when a Mr. Temple Nash drove up and stopped in front of the house, and as he got out of his car Agnes Taylor said: 'There goes that damned old fool (referring to Mr. Taylor) out to talk with Mr. Nash. That damned old fool hasn't got any more sense than to show Mr. Nash all that gasoline and oil in the garage and we won't get any insurance on anything' (Mr. Nash being an insurance agent). Then she run up and told Marion Taylor she would kick the damned hell out of him if he didn't get in the house and keep his damned mouth shut, and he (Taylor) went in the house." A. W. Smith would have testified: "That Agnes Taylor sometime during the summer of 1944

told him that Marion Taylor had gotten so he just wandered around the yard; he took no interest in anything and was worrying her to death the way he was acting, and from his actions she was of the opinion that he had lost his mind; you know Marion has lost his mind." James Taylor would have testified that sometime during the year 1944 Agnes Taylor, the proponent, stated to him: "James, from the way your father is acting, he has lost his mind; he will just walk off the place and we will have to send and get him; he has been acting very peculiar for a long time; he will just stand and look wild and act in all sorts of strange ways and doesn't want to be around anyone and will just stand motionless and stare into space."

■ We are of the opinion the trial court should have admitted the evidence of the witnesses as declarations offered against the interest of the proponent who was the primary beneficiary under the will and bearing directly on the issues involved as to the mental capacity of the testator and to the condition of his mind on the issue of undue influence.

■ The contestants further duly assigned errors to the jury argument of counsel for proponent in which he said: "Gentlemen, at the time Marion Taylor executed this will, he knew that he had provided amply for his first set of children, who are the contestants herein." The record evidence shows that the attorney making the argument testified in behalf of the proponent that he had been an attorney in Kaufman County for more than 40 years, had known the deceased testator for 50 years, was County Judge and District Attorney for Kaufman County, and as a practicing attorney had represented Mr. Taylor for about 10 years, saw him often, most every week in and about the town of Kaufman, and knew him well enough to qualify as to his mental capacity at the time he executed the will,—which in his opinion was sound. With such evidentiary background, the jury could have reasonably given credence to what the attorney said,—that the deceased had "pro-

vided amply for his first set of children," which declaration was clearly outside the record. The argument could have no other than a detrimental effect against the contestants on the closely contested issues. We are of the opinion that the argument was so prejudicial as to cause the reversal of the judgment of the trial court and to remand the case for a new trial. All points not discussed herein are overruled.

For the reasons above stated, the judgment of the court below is reversed and the cause remanded.