### CURRY et al. v. CURRY.

No. 3139.

Court of Civil Appeals of Texas.

Waco.

Feb. 18, 1954.

Rehearing Denied March 18, 1954.

Bowlen Bond, Teague, for appellants.

Justice, Justice & Rowan, Athens, H. L. Williford, Fairfield, for appellee.

TIREY, Justice.

Plaintiffs brought this suit against defendant to cancel a deed executed and delivered by N. S. Curry to defendant, Joseph Curry, dated the 21st of January, 1950, to certain parcels of land described by metes and bounds in the deed, and to partition the property therein described between plaintiffs and defendant, and alleged in effect that plaintiffs and defendants were entitled to have the property partitioned under the Statutes of Descent and Distribution.

At the close of the evidence the cause was submitted to the jury on one issue. It is: "Do you find from a preponderance of the evidence that the deed dated January 21, 1950, executed by N. S. Curry to Joe Curry was procured through undue influ-ence asserted upon N. S. Curry by Joe Curry, as that term 'undue influence' is herein-after defined. Answer 'Yes' or 'No.'", to which the jury answered "Yes".

The court gave the jury the following instruction: "* * * the term 'undue influence' is any fraudulent or designing means employed upon and with the maker of an instrument by which, under the circumstances and conditions by which such maker was surrounded, he could not well resist and which controlled his volition and induced him to do that which he otherwise would not have done. You are further instructed that 'undue influence' may be proven by circumstances, but such undue influence, if any, must have been operating upon the mind of N. S. Curry at the time the deed was executed."

After the jury returned its verdict the court overruled plaintiffs' motion for judgment and granted defendant's motion for judgment non obstante veredicto, and in the decree found that there was no evidence to support the jury's finding to Issue 1 and that the court should have instructed the jury to return a verdict in favor of defendant Joseph Curry, and found that the deed executed by N. S. Curry to Joseph Curry should not be canceled but should in all things be sustained, and decreed accordingly, and divested out of plaintiffs all of their claim of title to the property described in the deed from N. S. Curry to Joseph Curry and invested title to such property in Joseph Curry, and taxed all costs against plaintiffs.

The judgment is assailed substantially on the ground that the evidence tendered the issue of undue influence and that it was sufficient to sustain the answer of the jury thereto, and that the trial court erred in not granting plaintiffs' motion for judgment on the verdict and in granting Joe Curry's motion for judgment non obstante veredicto and entering judgment in favor of Joseph Curry.

Since the jury found that Joseph Curry obtained the deed from his father by reason of undue influence exerted on him by Joseph Curry, it is our duty (1) to

view the evidence in the light most favorable to the appellants; (2) "Also, to sustain the action of the trial court in granting judgment non obstante veredicto, *it must be determined that there is no evidence having probative force upon which the jury could have made the findings relied upon. * * *"* (3) " 'It was the jury's province to weigh all of the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable." ' " Burt v. Lochausen, Tex.Sup., 249 S.W.2d 194, 199, points 5, 6, 7. In so doing, it is also our duty to follow the rule announced by our Supreme Court in Long v. Long, 133 Tex. 96, 125 S.W.2d 1034, and Craycroft v. Crawford, Tex.Com.App., 285 S.W. 275 (judgment adopted); also Stewart v. Miller, Tex.Civ.App., 271 S.W. 311 (writ ref.); also Besteiro v. Besteiro, Tex.Com.App., 65 S.W.2d 759.

Evidence was tendered to the effect that N. S. Curry was almost 86 years old at the time he received his injuries; that he was a man of strong willpower and purpose; that he had accumulated some considerable livestock and was engaged in farming and ranching and that Joe Curry (age 51 and never married) had lived with his father during most of the past 20 years; that N. S. Curry sustained an accident resulting in the breaking of one leg and his hip on November 21, 1949, and was carried to the hospital at Teague, Texas, and remained in said hospital until June 9, 1950, at which time he was taken back to his home.

N. S. Curry, on January 21, 1950, executed and delivered a warranty deed to his son, Joe Curry, which contained pertinent to this discussion the following recital:

" * * * for and in consideration of the sum of $1.00 cash in hand paid, and other good and valuable considerations to me paid, by Joe Curry, as follows: $1.00 cash in hand paid, the receipt of which is hereby acknowledged and confessed, and for the further consideration that for the past 25 years Joe Curry, my dutiful son, has looked after my wants, took care of me in my old age, and lived with me and made his home with me, and is still living with me and taking care of me, and the further consideration that he is to continue to look after me in all my physical wants during the remainder of my life and after my death that he is to pay the necessary funeral expense of my funeral, buy a tombstone to place above my grave. I do not deed this property to him because I do not love my other children, but solely because of the fact that I feel like the services he has rendered me during the past 25 years and will continue to render me in taking care of me and my funeral expenses will equal the value of the property herein conveyed, and I am doing this not as a gift but as a payment for services rendered."

The deed further recites that the property conveyed is his separate property and it conveys all of the title of the grantor to the grantee, Joe Curry, and describes each of the three tracts of land by metes and bounds. There is a stipulation as to the children born to N. S. Curry and wife, Mattie J. Curry, and all the children of Mattie J. Curry and N. S. Curry born to them and surviving them are plaintiffs, except Joe Curry, who is one of the defendants; that N. S. Curry died November 30, 1951, intestate. Mattie J. Curry died testate in 1926.

On the trial of this case the plaintiffs called Joseph Curry to the witness stand as their first witness under the adverse witness rule. Joe said that it was his recollection that his father was injured about the 21st day of November, 1949, and it was about two years and nine days from the time of the accident until he died; that he went to Athens, Texas and had Mr. Will Justice write the deed; that it was about 60 or 65 miles from Teague to Athens, and that Bill Harper accompanied him on this trip. After the deed was written he brought it back with him and carried it to the hospital to his father; that he delivered the deed to his father at the hospital the next morning about 9:00 o'clock.

"Q. When you went over to Athens you told Mr. Justice what to put in the deed, the consideration, didn't you? A. No sir. * * *

"Q. You heard me read the consideration in the deed, what was specified and stipulated to be the consideration for the deed, didn't you? A. Yes, sir.

"Q. Who told Mr. Justice to put that in there? A. I don't know how come it in there."

That he carried with him the deeds that had a description of the land that he wanted placed in this particular deed and that he told Mr. Justice the land that his father had bought since his mother's death and what land he owned before; that he did not ask Dr. Gage nor Dr. Cox to come up and witness the deed. There is no evidence that Mr. Justice had ever seen the defendant Joe Curry before he was brought to his office by the witness Harper, nor is there any evidence that Mr. Justice had ever seen or visited or talked with N. S. Curry, the grantor in the deed.

M. B. Harper, called by defendant, testified in part to the effect that he had formerly lived in Van Zandt County, but had lived in Freestone County since 1939, some three-fourths of a mile from the Curry place; that he had visited in the home of N. S. Curry and knew the defendant Joe Curry; that N. S. Curry was a man of strong will-power and that he had sufficient mind to transact his business up until the time of his death; that while in Van Zandt County, he lived some 19 miles from Athens, Texas, and that he had occasion to know the Hon. Will Justice, a practicing lawyer of the Athens bar; that he was with the defendant, Joe Curry, and accompanied him to the office of Mr. Justice and was present when Joe told Mr. Justice what to put in the deed; · that he was in the office and heard Joe's conversation with Mr. Justice; that he introduced Joe Curry to Mr. Justice.

Miss Carroll, a trained nurse, testified to the effect that at the time of the trial she was living in Palestine, in the employ of the Missouri-Pacific Hospital; that she had previously worked at the City Hospital in Teague, having been there from January of 1949 until July of 1950; that she knew N. S. Curry during his lifetime; that he was brought to the hospital while she was working there and it was either in the latter part of 1949 or the early part of 1950, she did not remember the exact date; that the patient had a broken hip; that she was working there when Mr. Curry was taken from the hospital, but she did not remember the exact date; that she saw Joe Curry at the hospital several times.

"Q. Did you ever hear Joe Curry say anything to his father about the livestock, the cattle disappearing? A. Yes, I heard him tell him * * *.

"Q. What did you hear Joe Curry tell his father? A. That someone was stealing the cattle. * * *

"Q. Did you hear him tell his father who that someone was that was stealing the cattle? A. Yes, it was Julius. * * *

"Q. I will ask you, Miss Sallie, if you ever saw Joe Curry come to the hospital with any papers in his pocket? A. Yes.

"Q. Did you ever see him go to the room of his father with papers in his pocket? A. Yes sir. * * *

"Q. What, if anything, did you hear Joe say to his father about signing any papers? A. Yes, he wanted him to sign some papers for him, yes sir. * * *

"Q. What did he say, what did Mr. N. S. Curry say about signing the papers? A. He said, 'Hell No, I don't want to sign them, I would like to read them first,' he wanted to look over them before he signed them."

She further testified to the effect that she was at the hospital when Dr. Gage, Dr. Cox and Mr. McSpadden came to the hospital, and that Joe Curry was with them and they went in Mr. Curry's room; that she didn't see any papers that were signed that day.

Mrs. Robertson testified to the effect that in the latter part of 1949 her grandmother was in the hospital and was there from the first part of December until April, 1950,

and that she was in the hospital practically every day her grandmother was there; that she knew N. S. Curry and Joe Curry and saw Joe at the hospital and overheard a conversation between Joe and his father with reference to livestock on the farm.

"Q. What did you hear Joe Curry say to his father about the cattle or livestock? A. I just heard him tell Mr. Curry that every time Richmond or Clark or David was seen down at the farm there would be a few more cows missing. He said Julius came from Oklahoma in a truck and got a load, and if he didn't sign the papers they were going to steal him blind.

"Q. Did Joe, on that occasion, have any papers with him? A. He had something in his pocket, but I couldn't tell what it was."

That there was no one in the room with Joe and his father at the time she heard the conversation, and that she was seated in the lobby of the hospital and that the lobby of the hospital adjoined the wall of the room occupied by N. S. Curry.

Jake Simmons testified in part to the effect that he had known N. S. Curry 15 or 20 years before his death; that he visited him twice after he went to the hospital in the early winter; that he had a conversation with N. S. Curry about his cattle; that this conversation took place on his second visit to the hospital.

"Q. Did he say anything to you about his cattle or livestock the first time you went to the hospital? A. No sir.

"Q. Did he say anything to you the second time? A. Yes sir.

"Q. Was there anything said by Mr. Curry when you saw him on the first occasion in the hospital about signing any papers? A. He said Joe had some papers for him to sign, he didn't have any papers to sign that he knowed anything about.

"Q. After those two occasions, did Joe say anything to you or visit you, or come to your house? A. Yes sir, he come to the house.

"Q. Did Joe say anything about selling any cattle? A. Yes, he said he was selling the cattle, the boys were stealing them."

Elmer Utsey testified to the effect that he knew N. S. Curry and went to school with some of his boys and remembered when he was in the hospital at Teague; that he visited Mr. Curry in the hospital.

"Q. What did Mr. Curry say to you about signing papers? A. He said there had been some parties there with some papers to sign, he told them that he had no papers to sign, and he was not going to sign any * * *."

Mr. McSpadden testified in part to the effect that he was Cashier of the First National Bank of Teague; that he knew N. S. Curry; that he had known him for 30 years and that Mr. Curry did his banking business with his bank; that he took the acknowledgment on the deed from N. S. Curry to Joe at the City Hospital in Teague, and that Dr. Gage and Dr. Cox accompanied him to the hospital and were present when the deed was executed; that Joe Curry was present but not in the room at the time the deed was signed.

"Q. Was the deed read over to Mr. Curry? A. It was.

"Q. Who read it, do you recall? A. I didn't read word for word. I described the land to him and told him I didn't read the field notes. I just described each tract of land, so many acres in each survey and explained to him that he was deeding it all to Joe Curry, he said that was right. * * *

"Q. Clydell, who sent for you to come to the hospital? A. Bowlen, I don't remember, somebody called me over the telephone from out to the hospital. I presume it was from the hospital. I don't know who called me.

"Q. Did Joe say anything to you about going out there? A. Not that I remember."

That Mr. N. S. Curry had the deed with him when he got out there; that when someone called him from the hospital they

told him that if he didn't have a way to go that he could go down to Dr. Gage's office and that he did, and went with Dr. Gage and Dr. Cox.

Dr. Gage, of Teague, testified to the effect that N. S. Curry had a broken leg and hip when he came to the hospital and that he was there from November 21, 1949 until June 9, 1950; that he thought he was a man of sound mind except during short intervals when he had fever and was ill; that he was present when N. S. Curry executed the deed in question and that he thought N. S. Curry's mind was sound on the day he executed the deed; that he was a man of strong will-power; that he didn't know who called him and asked him to come to the hospital.

"Q. Had you heard of any deed before, being prepared before you were called to the hospital to witness this deed? A. I am sure I was aware of what I was going for. We all three went together."

Dr. Cox testified to the effect that he knew N. S. Curry and remembered him when he was in the hospital and he was present when the deed was signed; that he saw him almost daily while he was in the hospital.

"Q. During all the time he was in your hospital, was he at his right mind at all times? A. At times he was not.

"Q. What occasion would that be, if there was any special occasion? A. At a time when he had a high fever and he appeared delirious.

"Q. He was delirious from the fever, did you consider him sane at all times? A. He did not at that time.

"Q. At all other times except when he had high fever he was all right? A. A few days after his fever was gone he was still confused.

"Q. At the time he signed this deed, was he at that time suffering from any high fever or otherwise at that time? A. No."

He further testified to the effect that he was asked to go out to the hospital by Mr. Mc-

Spadden and that his best recollection was that they all left from their office.

Owing to the nature of the suit and the record here made, we have carefully reviewed all of the evidence tendered, and since it is our duty to look at such record in the light most favorable to the appellants, we think the court erred in disregarding the verdict of the jury and entering judgment for Joe Curry non obstante veredicto.

Here we have the grantor of the deed in his 86th year, sustaining a severe injury which made it necessary for him to be confined in the hospital from November 21. 1949 until June of 1950. The grantor had not been in the hospital very long until we have evidence to the effect that Joe Curry was trying to get his father to deed him all of his interest in the real estate the grantor owned and the evidence was to the effect that the grantor had acquired 48 acres after the death of his wife in 1926, and that he owned a one-half interest in 532.75 acres, which was the community property of grantor and his deceased wife. It is without dispute that Joe had lived with his father substantially all of the time since the death of grantor's wife, but the evidence does not show that prior to the time that grantor was brought to the hospital that Joe made any effort to get him to convey all of his property to him. (However, we think the jury, under the facts and circumstances here, may have reasonably inferred that Joe had done so, for the reason that while Joe's father was in the hospital, Joe undertook to make his father believe that some of his brothers were stealing his cattle and selling them, while in truth and in fact the cattle were being sold by Joe). Under all the facts and circumstances here tendered it is obvious that there would arise in the mind of the jury the question, what purpose could Joe have had in telling his father that his father's cattle were being stolen and sold by his brothers except to alienate his father's affection from the other children and make his father believe that he was the one that was looking after him and caring for him and protecting his property, and

thereby obtain his signature to the deed in question? Moreover, Joe's testimony as to the preparation of the deed is inconsistent with all the facts and circumstances and is contradictory to that of his close friend and witness Harper. Under this record it is without dispute that Joe had never known the attorney he selected to prepare this deed, nor had the attorney ever seen or visited with his father, and Joe said that he did not give the information to the lawyer to prepare the deed. On the other hand, his witness, Bill Harper, said that he took Joe to the office of the attorney who prepared the deed and that he heard Joe talk with the Hon. Will Justice and tell him what he wanted in the deed. Moreover, Joe testified to the effect that he did not call either Dr. Cox or Dr. Gage to come to the hospital to see the deed executed and acknowledged by his father and that he did not know why they came. Dr. Cox and Dr. Gage and Mr. McSpadden each testified to the effect that they did not know or remember who called them to come to the hospital to witness the execution of the deed, yet they knew the purpose for which they were going and that when they got to the hospital they saw Joe but he was not in the room at the time the deed was executed by his father. Notwithstanding the fact that two witnesses testified to conversations that they heard between Joe and his father in which Joe stated to his father in effect that his brothers were stealing his cattle and selling them, yet Joe did not take the witness stand and deny these conversations, nor did Joe deny the statements made by other witnesses to the effect that he was selling his father's cattle while his father was in the hospital. Joe's witness, Bill Harper, was recalled to the stand by plaintiffs and he testified to the effect that while Joe's father was in the hospital he helped Joe load two trailer truck loads, and Joe did not deny this.

Our view of the record here is that the evidence is ample to support the jury in its finding that Joe obtained the execution of this deed from his father by the practice of undue influence upon him, otherwise he would not have told his father these false statements concerning his brothers, which we have above detailed, and, in so doing, obtained all of his father's interest in and to the estate to the exclusion of the other eight surviving children, same being his brothers and sisters of the whole blood. Kellahin v. Henderson, 5 Cir., 81 F.2d 128; Henderson v. Kellahin, 299 U.S. 551, 57 S. Ct. 13, 81 L.Ed. 406; Kincheloe v. Kincheloe, Tex.Civ.App., 152 S.W.2d 851 (writ ref. w. o. m.).

■ Being of this view, we think it is our duty to follow the rule of our Supreme Court in Burt v. Lochausen, supra, and accordingly, the judgment entered by the trial court to the effect that the deed executed by N. S. Curry to Joe Curry of date January 21, 1950, and recorded in Vol. 210, page 22, Deed Records of Freestone County, Texas, "should not be canceled and held for naught and should in all things be sustained" is hereby reversed and judgment is here rendered that said deed be canceled and held for naught because of the undue influence practiced upon N. S. Curry by Joe Curry. The judgment in all other respects as to other parties is reversed and remanded in order that the court may proceed with a partition of the property as prayed for by the plaintiffs and the defendants, Mrs. Eunice Williford, R. W. Williford, H. B. Williford, H. L. Williford, Ella Williford Kuhn and husband, J. H. Kuhn, and Mrs. Addie Smith, a widow, in this cause, and in order that all of the parties hereto may assert their interests and rights in the partitioning of the property described in plaintiffs' petition. The costs of this appeal and the costs below are taxed against defendant Joe Curry.

Reversed and rendered in part and in part reversed and remanded.