**POOL et al. v. BOYER et al.**

No. 3151.

Court of Civil Appeals of Texas.

Waco.

May 6, 1954.

Rehearing Denied May 27, 1954.

Abney, Hammett & Lynch, Lampasas, H. W. Allen, Hamilton, Truman E. Roberts, Hico, for appellants.

Bryan, Maxwell, Bryan & Wilson, Waco, L. Brann, Lubbock, P. M. Rice, Hamilton, for appellees.

TIREY, Justice.

Appellants brought this action to set aside the last will and testament of Jasper Pool, their contest being grounded on undue influence practiced on the testator by appellees. The County Court of Hamilton County admitted the will to probate and contestants seasonably perfected their appeal to the District Court of that county. That court submitted one issue to the jury, namely: "Do you find from a preponderance of the evidence in this case that at the time of the making of the will in question herein, on March 5, 1949, the said Jasper Pool was induced to make said will by the exercise of undue influence upon him by Mrs. Bertie Boyer and Mrs. Bessie Blake, or either of them?", to which the jury answered "Yes." The court overruled contestants' motion for judgment and granted appellees' motion for judgment non obstante veredicto and decreed that the will of Jasper Pool be admitted to probate and that contestants of said will take nothing. The contestants seasonably perfected their appeal to this court.

The judgment is assailed substantially on the ground that there is evidence in the record sufficient to sustain the finding of the jury to the effect that the will of Jasper Pool was the result of undue influence exerted upon him by appellees.

Appellees contend in effect (1) that there is no evidence of probative force to establish that the will of Jasper Pool resulted from undue influence exerted upon him by contestees; and (2) that if there is any evidence showing that such will was the result of undue influence, then in such event it was insufficient to sustain the verdict of the jury, and in either event the court should have granted motion for judgment non obstante veredicto.

We quote the second and third sections of the will, which are pertinent here:

"Second: It is my will and desire that my two daughters Bertie M. Boyer and Bessie Blake, each receive the sum of Two Thousand Dollars out of my estate before the division thereof. I make this decision after the most careful consideration, not as a matter of favoritism, but because I think that they deserve it. It is given with the provision that neither of them will claim any additional compensation for their services, to care for me.

"Third: I also direct that my son Ernest M. Pool shall receive the sum of $400.00 out of my estate before the division thereof.

"After payment of the three legacies above mentioned, then the remainder of my estate shall be equally divided among my four children, Bertie M. Boyer, Bessie Blake, Ernest Pool and W. R. Pool and no others.

"I do not leave anything to the four children of my son John C. Pool for the reason that the said John C. Pool having been unfortunate in some of his business transactions and having been unwell a considerable portion of his life I have paid out money to him and for him in excess of what his just share would be. In order there may be no question about my intentions in this matter I leave to his children J. C. Pool, Jr., Louise Pool, Billie Pool and

Kenneth Pool the sum of One Dollar each."

Much has been written by our Supreme Court and our Courts of Civil Appeals on the question of undue influence as it relates to wills, and perhaps those decisions most helpful and applicable here will be found in Long v. Long, 133 Tex. 96, 125 S.W.2d 1034; Besteiro v. Besteiro, Tex.Com.App., 65 S.W.2d 759; Bergstedt v. Bender, Tex. Com.App., 222 S.W. 547; Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138. See also Hart v. Hart, Tex.Civ.App., 110 S.W. 91, no writ history; Craycroft v. Crawford, Tex.Com.App., opinion adopted, 285 S.W. 275. See also Stewart v. Miller, Tex.Civ. App., 271 S.W. 311, opinion by Chief Justice Gallagher; Rankin v. Rankin, 105 Tex. 451, 151 S.W. 527; Olds v. Traylor, Tex. Civ.App., 180 S.W.2d 511, writ ref., opinion by Chief Justice Rice; Barksdale v. Dobbins, Tex.Civ.App., 141 S.W.2d 1035, writ ref.; Goodloe v. Goodloe, 47 Tex.Civ.App., 493, 105 S.W. 533, writ ref.; Venner v. Layton, Tex.Civ.App., 244 S.W.2d 852, n. r. e.; Curry v. Curry, Tex.Civ.App., 265 S.W.2d 899.

■ Since the trial court disregarded the verdict of the jury and entered judgment for the contestees, it is our duty here to consider whether this record is entirely bare of facts which would justify the rejection of this will as a product of undue influence exercised over the mind of the testator by the contestees. In so doing we must bear in mind that the jury has found such undue influence and we must therefore indulge the presumption that the jury believed and accepted all probative evidence tending to support its verdict. The foregoing is substantially the statement of the rule in Point 10 in Long v. Long, supra.

■■ In considering the testimony adduced, it is our duty to bear in mind the following rule which is in accord and substantially to the same effect as the rule we have just quoted; "Where the facts are controverted, or are such that a different inference may be reasonably drawn therefrom, an issue of fact is raised; it is

only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.'" See Points 8 and 9, Olds v. Traylor, supra, and authorities there cited.

So we come now to a consideration of all of the facts and circumstances tendered by the evidence to determine whether or not the issue of undue influence was raised, and, if so, whether it is sufficient to sustain the jury's verdict.

Jasper Pool executed his last will and testament on the 5th of March, 1949, at which time he was 89 years, 11 months and four days old, and on the eighth day after the death of his son, John C. Pool. Jasper Pool died in August, 1952, at which time he was 93 years, four months and 28 days old. John was the father of the contestants. The testator was married one time only and he and his wife executed a will in which each willed to the other all property which the one predeceasing shall own. Testator's wife died in the Fall of 1929 and Jasper Pool took all of the title to the property and their children took nothing. John and his family moved into the Jasper Pool home after the death of his wife and they remained there until 1934. These contestants were all born while John and his wife were living in this immediate vicinity, some of them having been born in the home of the testator. In 1934 John and his family moved to Oklahoma and Mrs. Boyer, one of the appellees and a daughter of Jasper Pool, came to live with the testator and remained there until he died. Mrs. Blake, the other appellee, came to live with the testator and her sister in 1945 and lived there until testator's death. John C. Pool and his wife were divorced in 1947 in the State of Okla-

homa and thereafter he came back to Hamilton County and lived with his father until his death.

The record is silent as to any differences between Jasper and his son John, and the record justifies the jury in believing that the testator had equal regard for all of his children until he came to make his will in March, 1949. The jury had the right to draw such inference because after the death of testator's wife in 1929, if the testator had died his property would have passed to his children and grandchildren under the laws of descent and distribution, because his first will had bequeathed all of his property to his wife who preceded him in death. (The first will of the testator is not before us but as we understand the parties' briefs, his first will bequeathed all of the property to his wife). There was testimony that authorized the jury to believe the testator loved his grandchildren and that the grandchildren loved him.

Mrs. Boyer, one of the appellees, testified in part in some detail with reference to the transactions that John Pool had with his father. She seemed to be familiar with the way that John and his father operated, particularly in the handling of their cattle and goats. She testified to some of the transactions that John had concerning the buying of goats in Arkansas, as well as some cattle. She also testified to certain checks that she found in her father's bank statements where her father had paid for some of the cattle and goats purchased by John. She also had in her possession some papers which she said evidenced transactions between her father and John, one being a note for $760; that she assisted John in the buying of some cattle in Oklahoma and her sister also participated in some of the transactions that John had, but that she did not know how much money John made but that she and her sister got their money back that they put out on the Oklahoma deal. She testified to another transaction that she and her sister and testator had with John in which she said in effect that John owed her and her sister and her father $1,000, but that she and her sister got their part of the money out of the $1,000 and that their father absorbed this loss.

Testimony was tendered to the effect that Jasper Pool, prior to his death, borrowed approximately $4,100, for which he executed a deed of trust and note, and the court permitted Mrs. Boyer, over objection, to testify that this debt and deed of trust were made by Jasper Pool in order to pay John's debt. (The man who made the loan said he looked to Jasper for the money, but that he asked John to sign the note). She further testified in part: "Q. Were you even in town the day your father executed this will? A. No, sir. Q. When did you learn that the will had been executed? A. Well, after these children— one time they had been down there—would always ask their grandpa how much they were going to get out of the estate. I heard them ask him one time * * *."

Louise Pool, one of the granddaughters and contestants, testified in part:

"Q. In the letters that you received from your grandfather did they ever have anything to say in bitterness toward you children? A. No, sir, not in the least.

"Q. Love and affection existed between all three of you all the way? A. Yes.

"Q. Louise, we have gone somewhat into your father's estate, did you all receive anything at all from your father's estate? A. No, sir, not a dime, we didn't get a dime.

"Q. Do you know whether he had anything when he came down here? A. He should have.

"Q. Do you know of your own knowledge that he did have? A. Yes.

"Q. What? A. One-half of what we had in Frederick?

"Q. What would that amount to? A. I would say about $2,000 or $2500.-00.

"Q. Was that in cash or goods?
A. Well, he should have had that in cash.

"Q. He had some machinery or tools? A. Yes. * * *

"Q. Louise, referring to this old debt against your father and to your grandfather, who did you ever hear mention that? A. Well, we never did hear grandfather mention it. We were down here when Dad died and everytime we would think we had settled up what he owed, the doctor bill and funeral bill, they would bring up the old debt.

"Q. Who? A. Aunt Bertie and Aunt Bessie.

"Q. Bring it up more than once? A. Several times.

"Q. Your grandfather never mentioned it? A. No, sir.

"Q. Did your Aunt Bertie and Aunt Bessie make claim against you children for nursing fee for your father? A. Yes, they did."

The evidence tendered was to the effect that John's illness was from January 31st to February 25th, and that he was in the hospital for eleven days, and that the bill tendered by Mrs. Blake and Mrs. Boyer was $260, which amounted to $10 per day each for thirteen days. Except for the last illness of John Pool, it is not shown that he had any medical care that anyone other than himself had to pay. He was a World War I veteran and he was entitled to and availed himself of Veterans Administration hospitalization without cost on two separate occasions.

Evidence was tendered to the effect that Mrs. Boyer and Mrs. Blake had ill feeling against the contestants and their mother. Louise Pool testified to the effect that once, while she and the other grandchildren were there to visit their grandfather, that her Aunt Bertie Boyer and a daughter of Mrs. Blake, took a 22 rifle away from Mrs. Blake, and further testified:

"Q. When did the pistol come up? A. After they had taken the twenty-two.

"Q. How about this pistol; how did you know about that? A. Well, when they were going back in the house with the twenty-two I asked Aunt Bertie where she was going hunting, and she told me, no, that Aunt Bessie always lost her head when she saw my mother and that she just shouldn't come out there. About that time Aunt Bessie went back in the house and she was calling my mother all kinds of things and I had a fuss with her and she went on upstairs and she came back down and Billie was in the hall then, and she made the remark at that time that she loaded that gun six years ago to kill that black bitch and she was talking about my mother. Billie asked what was in the sack and she said it wasn't any 'of his damn business.' And he took the sack away from her and it was a pistol.

"Q. Did you see her with another gun? A. No. I don't think there was another gun, but we were leaving—so we got in my car and went to drive away.

"Q. Did your grandfather take any part in this? A. No, he tried to settle us all down, said he hated for it to come up."

Mrs. Boyer also testified to the effect that after she moved into the home of her father that she took care of him, bought the groceries, cooked for him and the hired man, nursed her father many times, and did the farming and took care of the stock, and that she was aided in these matters by her sister, Mrs. Blake, who came to live with her father and her sister in 1945; that she and Mrs. Blake drove him in the car when he had to travel farther than his restricted license permitted, which was approximately three miles to the store called "Shive"; however, Mrs. Boyer said that her father did at times drive his car farther than he was authorized to do

under his license, and that he had at times driven to Hamilton. No exact time or date was given, however. Mrs. Boyer also testified to the effect that her father rented the place to her and her sister in 1945 and at that time they talked with him about his making a will, but he made no will then.

The record here is silent as to who prepared the will of Jasper Pool; however, both parties assumed in their briefs that the will of Jasper Pool, here tendered for probate, was prepared by the Hon. P. M. Rice of Hamilton. Judge Rice did not testify. The record here shows that the will was executed by the testator in the County Clerk's office at the courthouse in Hamilton. There is an absence of testimony as to how the testator got in touch with Judge Rice; however, Mrs. Boyer testified to the effect that she did not know about the execution of the will until sometime after it was executed and she did not know how her father got to Hamilton but later learned that a former acquaintance by the name of Edwards took her father in a car to Hamilton. (Edwards was not tendered as a witness). There is an absence of testimony as to whether the will was prepared by Judge Rice on the day it was executed, as well as an absence of testimony as to who employed Judge Rice to prepare the will and who gave him the instructions as to the provisions of the will. The will was typewritten and was attested by three subscribing witnesses. There is no evidence that Jasper Pool had been in Hamilton at any time just prior to the time that he executed the will, or that he had seen and talked with Judge Rice.

Although the grandchildren testified that just after their father's death, while they were trying to talk with their grandfather about their father's business and what they would receive from his estate and that these conversations were broken up by their aunts, Mrs. Boyer and Mrs. Blake, yet none of these conversations were denied by Mrs. Boyer (Mrs Blake was not tendered as a witness), nor did Mrs. Boyer testify or make any explanation of the hostile feeling that the grandchildren said that she and Mrs. Blake exhibited toward them on their visits to their grandfather. These grandchildren further testified to the effect that in order to talk to their grandfather about their father's affairs and about what would happen to his property after his death, that the grandfather would have to take them away from the house and out of the presence of Mrs. Boyer and Mrs. Blake. Notwithstanding the fact that Mrs. Boyer attempted to acquit herself of all attempts to exert or exercise any influence upon her father in the preparing of this last will and that she knew nothing about it, she did not attempt to do so insofar as her sister Mrs. Blake was concerned, and since she was an interested witness under all the facts and circumstances, the credibility of her testimony necessarily had to be submitted to the jury. Flack v. First National Bank of Dalhart, 148 Tex. 495, 226 S.W.2d 628, points 9–10, page 633. Also Texas & N. O. R. Co. v. Pool, Tex. Civ.App., 263 S.W.2d 582, 590, pt. 10, and authorities there collated.

Since there was no testimony tendered as to when and where the scrivener of the will got the information that was placed therein, and since Mrs. Blake and Mrs. Boyer did not attempt to explain their hostility to the grandchildren and contradict the testimony of the contestants, and particularly with reference to Mrs. Boyer's and Mrs. Blake's efforts to interfere with contestants while contestants were talking to their grandfather immediately following their father's death as herein set out, it is our view that their silence under the circumstances is of probative force on the issue of undue influence exerted by them upon the testator. See Craycroft v. Crawford, supra, point 5, and cases there cited. See also Taylor v. Taylor, Tex.Civ.App., 248 S.W.2d 820, no writ history, point 5 on page 824, and cases there cited; Moos v. First State Bank of Uvalde, Tex.Civ. App., 60 S.W.2d 888, writ dis.; 31 C.J.S., Evidence, § 156, page 847; Matthews v. Wilson, Tex.Civ.App., 141 S.W.2d 747, point 1; 64 C.J. 513; 16 Texas Digest, Evidence,

In Sullivan v. Fant, Tex.Civ.App., 160 S.W. 612, 616, writ ref., we find this statement of the rule: " 'When the proof tends to establish a fact and at the same time discloses that it is within the power and to the interest of the opposing party to disprove it, if false, the silence of the opposing party not only strengthens the probative force of the affirmative proof but of itself is clothed with a certain probative force.' "

The testimony tendered in this record consists of approximately 100 pages of legal size typewritten pages. Necessarily we cannot set out every fact and circumstance in this record which we think pertinent and favorable to the contestants, but we have examined all of the testimony tendered with great care, in the light of the rule stated by our Supreme Court in Long v. Long, supra, and Olds v. Traylor, supra, and the other cases here cited, and after so doing, and since the jury found that undue influence was exercised on the testator, it is our considered view that the record on the whole tenders the issue of undue influence exerted by appellees upon Jasper Pool, and that it is sufficient to sustain the finding of the jury thereon.

In Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, our Supreme Court has recently made this statement of the rule, which is here applicable: (A) In order "to sustain the action of the trial court in granting judgment non obstante veredicto, it must be determined that there is no evidence having probative force upon which the jury could have made the findings relied upon" and (B) " 'it was the jury's province to weigh all the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable." ' " Points 5–6, 249 S.W.2d at page 199.

It is our view that the application of the foregoing rules to the factual situation here require us to reverse and render the judgment of the District Court of Hamilton County and enter judgment denying the probate of the last will and testament of Jasper Pool.

Accordingly, the judgment of the District Court of Hamilton County is reversed and rendered and the order admitting the last will and testament of Jasper Pool to probate is set aside, vacated and held for naught, and it is the further order of this court that this judgment be certified to the District Court of Hamilton County and to the County Court of Hamilton County for observance.